**CASEY v. AMERICAN EXPORT LINES, Inc.**

No. 74, Docket 21101.

United States Court of Appeals
Second Circuit.

Feb. 28, 1949.

Harry Eisenberg, of New York City (Jacob Rassner, of New York City, of counsel), for plaintiff-appellant.

Haight, Deming, Gardner, Poor & Havens, of New York City (Edgar R. Kraetzer, J. Ward O'Neill and J. M. Estabrook, all of New York City, of counsel), for defendant-appellant.

Before L. HAND, Chief Judge, and SWAN and CHASE, Circuit Judges.

SWAN, Circuit Judge.

This is an action under the Jones Act, 46 U.S.C.A. § 688, to recover for the wrongful death of James J. Casey, deceased. He lost his life on January 13, 1945 in a fire aboard the S.S. Morris Sigman, on which he was employed as master. The vessel was owned by the United States and was operated by the defendant, American Export Lines, Inc., as general agent under the standard form of War Shipping Administration Agency agreement. The case was tried to a jury which returned a verdict for the plaintiff of $65,170. In taxing the bill of costs the clerk of the court added to the verdict interest at 6% from the date of death, but a subsequent order of the court struck out the provision for interest. From this order the plaintiff has appealed. The judgment was further reduced by the sum of $5,500 representing the amount paid the

plaintiff under a War Risk Insurance policy. From the resulting judgment for $59,670 and costs the defendant has appealed. The plaintiff's appeal asserts error in eliminating interest on the verdict from the date of death; the defendant's appeal asserts error (1) in the charge to the jury, (2) in denial of its motion to dismiss for failure of proof, and (3) in refusal to dismiss for lack of jurisdiction.

■■ The plaintiff's appeal requires but brief discussion. In prior cases this court has ruled that neither the Jones Act nor the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., permits the awarding of interest on the verdict from the date of death. Cortes v. Baltimore Insular Line, 2 Cir., 66 F.2d 526, 529; see also Briggs v. Pennsylvania R. Co., 2 Cir., 164 F.2d 21, 22. The plaintiff asserts that this rule conflicts with the answer given to a certified question in American Stevedores v. Porello, 330 U.S. 446, 460, 67 S.Ct. 847, 91 L.Ed. 1011, from which it follows that the law of New York governs as to the question of damages, including interest. But in Lauro v. United States, 2 Cir., 163 F.2d 642, we held that that answer did not deal with the matter of interest. We adhere to our former ruling.

■ The first error claimed by the defendant is without merit. It relates chiefly to the court's denial of request No. 10: "When Captain Casey came aboard the vessel it was his duty to assure himself that the proper sea watches were set and were being adhered to properly." We fail to see how the refusal of this request can have been of any significance in view of the granting of request No. 11, which was read to the jury at the conclusion of the court's general charge, as follows: "The master of a vessel, whether on board or ashore, is primarily responsible for her safety." After reading this and other allowed requests, counsel for the defendant said "I have no exception to your Honor's charge." See Rule 51, Federal Rules Civil Procedure, 28 U.S.C.A.

■ The defendant's second point on the appeal is the claim of error in the denial of its motion to dismiss the complaint for lack of proof. This presents the question whether there was any evidence, when viewed in a light most favorable to the plaintiff, upon which the jury could have found negligence on the part of the defendant which contributed, in whole or in part, to his death. Eckenrode v. Pennsylvania R. Co., 335 U.S. 329, 330, 68 S.Ct. 91.

■■ The fire in which Capt. Casey lost his life occurred in his own quarters during the early morning hours of January 13, 1945. The Morris Sigman is a Liberty type vessel. The captain's quarters consist of a stateroom and adjoining office just aft of the wheelhouse. There is a door between the two rooms and each room has a door into the adjacent alleyway. The vessel lay at a dock in Boston, Massachusetts, and was scheduled to sail about 6 A.M. Sea watches had been ordered, and the second officer was in charge of the watch from 12:00 A.M. to 4:00 A.M. During this watch (the exact time being in dispute) Capt. Casey and the purser came on board, and, after changing his clothes in his quarters, the captain went to the officer's saloon mess for sandwiches and milk. He remained there until approximately 3:30 A.M., and left presumably to go to bed. He was not again seen alive. After the fire was extinguished his badly burned body was found on the floor of his office, face down, with his head near the exit door where he had apparently collapsed and fallen. The distance from the bunk in his stateroom to where his body lay was about 20 feet. The Medical Examiner's death certificate assigned as the cause of death "flame burns of body and extremities." An autopsy disclosed the presence of a small amount of alcohol and a larger amount of carbon monoxide.[1] In answer to hypothetical questions based on the autopsy an expert toxicologist expressed the opinion that the captain was not intoxicated and did not die from carbon monoxide poisoning but was burned to death after he lost consciousness due to the exhaustion of oxygen in his quarters.

Exactly how and when the fire started is not determinable nor is it material, since

---

[1] "The chemical analysis showed the following: carbon monoxide, 18.4; alcohol, brain .16; blood .23; urine .32; stomach .37."

the plaintiff makes no claim that the fire was caused by the defendant's negligence.[2] The claim is that failure to discover the fire promptly and to take effective measures to combat it were faults which resulted in the captain's death. The charges of negligence submitted to the jury were three:

"1. That the defendant failed to maintain and keep proper and adequate fire watches;

"2. That the defendant failed to discover promptly the fire on the vessel; and

"3. That the defendant failed to take prompt action to extinguish the fire."

As to each of these charges we think the evidence was sufficient to require submission to the jury. Testimony of an expert was introduced to the effect that when the second officer takes a sea watch he is supposed to keep a watch on the bridge, and that of the two shore watchmen, who were in his watch, one is supposed to keep a gangway watch and the other to keep a patrol of the deck. Neither the second officer nor any seaman kept watch on the bridge, and the chief steward testified that he found the two shore watchmen in the crew's mess room about 3:15 A.M. and left them still there when he went back to bed after getting a cup of coffee. How long they had been there and how long they remained does not appear. The first discovery of the fire was made about 3:55 A.M. by James Haug, a fireman-water-tender in the engine room, who saw smoke coming out of the speaking tube that leads from the wheelhouse to the engine room. There was testimony that it would take some time—perhaps 30 minutes or more—for smoke to travel from the scene of the fire into the wheelhouse and thence down to the engine room through the speaking tube. On discovering the smoke Haug ran up to the deck to spread the alarm. He notified the chief mate and others of the ship's crew. The general alarm was sounded at 4:05 A.M. The chief mate was one of the first to reach the captain's quarters from which smoke was billowing. He found the doors leading into the stateroom and the office locked from the inside. Thereupon he broke in the stateroom door but the intense heat and flame coming from the room made it impossible to enter it. An attempt was made to use the ship's inside fire-hose but according to the testimony of Anderson the pressure was so low that only a trickle of water came out and a delay of ten to fifteen minutes occurred before the larger outside hose was put into operation. On the other hand, Haug testified that as soon as he had spread the alarm he ran back to the engine room and found the second engineer starting the fire pumps. This statement is in sharp contrast with testimony that the second engineer had failed to report back to the ship that night. It was for the jury to resolve the conflict. All the portholes of the captain's quarters were dogged down from the inside and had to be broken in with axes before the outside hoses could be played on the fire. With the aid of the Boston City Fire Department and the Harbor Fire Department which had responded to alarms the fire was brought under control and the captain's body was removed from the charred office at 4:44 A.M. The contention that there was no proof of negligence cannot be sustained.

■■■■ The defendant contends further that in any event there was no proof of causal relation between the charges of negligence and the death of Captain Casey. It must be conceded that in the absence of proof of such causal connection, the defendant's negligence is not actionable. St. Louis-San Francisco R. Co. v. Mills, 271 U.S. 344, 347, 46 S.Ct. 520, 70 L.Ed. 979; Chicago M. & St. P. R. Co. v. Coogan, 271 U.S. 472, 478, 46 S.Ct. 564, 70 L.Ed. 1041. It must also be conceded that the precise moment of Capt. Casey's death is unknown and that even if the fire had been discovered promptly and if the inside fire-hose had been available under sufficient pressure without any delay, one can not know with certainty that the captain's life would have been saved. Cf. Di Nicola v. Pennsylvania R. Co., 2 Cir., 158 F.2d 856, 857. But almost every verdict of a jury involves

[2] The deputy chief of the Boston City Fire Department, who examined the premises after the fire was extinguished, was of the opinion that it originated in the vicinity of the captain's bunk.

**328**

the element of speculation or conjecture to some extent. As was said in Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916:

"It is no answer to say that the jury's verdict involved speculation and conjecture. Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable."

We cannot say that the record herein is bare of any evidence to support the jury's inference that the negligence of the defendant contributed to the death. The jury could reasonably find that the fire started after Capt. Casey had returned to his cabin about 3:30 A.M., since it is unlikely that he would have locked the door if there were smoke in the room when he entered. From the testimony that the fire started in the vicinity of the captain's bunk and that the center of the bunk, at a point about the length of a man's extended arm, showed the deepest burning, it is not unreasonable to infer that the captain was smoking in bed and the fire was started by a lighted cigarette after he fell asleep. The fire must have gained considerable headway before it so exhausted the oxygen of the quarters as to cause him to lose consciousness after he awoke and walked into the adjoining office. Had the second officer or a seaman been on watch on the bridge it may be inferred that the smoke would have been discovered many minutes before it could have seeped down to the engine room through the wheelhouse speaking tube. While it is conceivable that the captain may have been burned to death before the smoke got into the wheelhouse, the opposite inference is just as likely to be the correct one; indeed it seems the more reasonable. The jury may also have inferred that delay in having sufficient water pressure in the fire-hose was a contributing cause of the death. Courts are not at liberty to reweigh the evidence and set aside the jury's verdict merely because the jury could have drawn different inferences. Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520. In our opinion the causal relation between the negligence and the death was a question for the jury.

The final point, namely that the court lacked jurisdiction, was decided adversely to the defendant's contention in Cosmopolitan Shipping Company v. McAllister, 2 Cir., 169 F.2d 4, now pending on certiorari.

Accordingly, we affirm the judgment but we will withhold our mandate until the McAllister case is decided by the Supreme Court.