**SCHWECKE et al. v. UNITED STATES et al.**

No. 24789–S.

United States District Court
N. D. California, S. D.

March 7, 1951.

226

Fitz-Gerald Ames, Hugh B. Miller, San Francisco, Cal., for libelants.

Frank J. Hennessy, U. S. Atty., Antoinette E. Morgan, Asst. U. S. Atty., San Francisco, Cal., for respondent, United States.

Dorr, Cooper & Hays (Jay T. Cooper) San Francisco, Cal., for respondents Williams-Dimond & Co., and Moran Towing & Transp. Co.

Hoge, Pelton & Gunther (Reginald M. Watt), San Francisco, Cal., for respondents Lester F. Stone dba W. F. Stone & Sons.

McLAUGHLIN, District Judge.

### 1. Introduction.

Invoking the provisions both of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 933, and of the Jones Act, 46 U.S.C.A. § 688, the libelants herein, as heirs of Fred Schwecke, are suing for general damages in the sum of $500,000 and special damages in the sum of $125, with costs, arising from Mr. Schwecke's death by drowning in the Oakland Estuary, at Alameda, California, on December 24, 1945.

### 2. The Pleadings.

The first amended libel in personam sets forth two causes of action. The first is based upon Section 33 of the Longshoremen's and Harbor Workers' Compensation Act, which permits a person entitled to compensation "on account of a disability or death", to elect to receive such compensation or to recover damages against a person other than the employer, if he determines that such third person is liable.

The amended libel alleges that the United States, one of the respondents, through the War Shipping Administration, was the owner of the S. S. St. Simon at the time of the accident; that the respondents Williams-Dimond Co., Moran Towing and Transportation Company, and W. F. Stone operated that vessel as general agents; that Stone owned a ship dock, including gangplanks and areaways between the dock and the St. Simon, at Alameda, where the vessel was moored; and that all of those respondents were under "the joint and concurrent duty to maintain * * * said vessel in a safe condition and to provide * * * Fred Schwecke * * * with a safe place to work and to maintain said vessel * * * in a seaworthy condition."

It is further alleged that on December 24, 1945, while the St. Simon was berthed "at and near" the Stone ship dock, Mr. Schwecke was employed by the Young Patrol Service of San Francisco as a guard and watchman on the vessel; that at the time of the accident he was on board; that he "fell from said vessel and gangplank and was drowned"; that he was caused to fall into the water "as the direct and proximate result of the joint and concurrent acts of negligence of all the respondents and each of them, in the * * * management * * of the said vessel and the said dock, including the operating gear of said vessel and dock, gangplank from said shop to said dock, gangplank ropes, stanchions and fasteners to said gangplank, said vessel, and said dock, railings, equipment and lights," etc.

The libel recites that at the time of Mr. Schwecke's death the libelants were dependent upon him for support; and that he was then 59 years old.

It is also alleged that the libelants have been paid $1,200 from the State Compensation Insurance Fund, pursuant to an award of the United States Employees' Compensation Commission, the said Fund being the compensation insurance carrier for the decedent's employer, Young Patrol Service; that subsequently the Fund and the Young Patrol Service made an assignment to the libelants of all their rights against the respondents, and a "reassignment" to the libelants of all rights which the libelants may have had against the respondents prior to December 23, 1946, including any rights that may have been assigned to the Fund as compensation carrier and to Young Patrol Service, by operation of law or otherwise. It is also served that notice of election to sue has been filed with the above-named Commission by the libelants, pursuant to Section 33 of the Longshoremen's and Harbor Workers' Compensation Act, and that Young Patrol Service insured the decedent against industrial injury with the

Fund, and the Fund, "as the compensation insurance carrier of decedent, has paid compensation to libellants."

In setting forth their second cause of action, the libelants re-allege each averment in their first, and add the following:

Mr. Schwecke was responsible to the master of the ship, and had the duty to prevent theft of its property and the boarding of the vessel without a pass; to inspect all articles brought on or taken off the ship; to hold the luggage of persons other than the officers or crew members, for the inspection of the captain, etc. For such purposes, the decedent had to keep in view and guard the gangway extending from the ship to dock, and could not leave his post until relieved by another guard. The decedent's duties were such as to constitute him a "seaman" within the meaning of the Jones Act.

The United States, Williams-Dimond, and Moran filed an amended answer, the details of which need not be set forth here. In general, the answer denied most of the allegations of the amended libel, pleaded the affirmative defense of contributory negligence, alleged that Mr. Schwecke's fall into the bay· "was due to his state of intoxication," and asserted that if Mr. Schwecke was responsible to the master of the St. Simon—which the answer denied—he was in the exclusive employment of the United States, and that, pursuant to the provisions of the War Shipping Administration (Clarification) Act of 1943, 50 U.S.C.A. Appendix, § 1291, and the regulations thereunder, the libelants' sole remedy is against the United States in admiralty.

The respondent Lester F. Stone, sued herein as W. F. Stone, doing business under the name of W. F. Stone & Sons, filed a separate answer. Since this respondent's motion to dismiss the amended libel as to him was granted during the trial, his separate answer need not be considered.

The first amended libel was further amended so as to include, as part of the respondents' joint responsibility for the maintenance and repair of the St. Simon and its "operating gear", a plank "from said ship to other ships docked nearby". It was alleged that the respondents were jointly negligent in the "maintenance and upkeep", inter alia, of a plank from the St. Simon to the S. S. Mata Gorda, "docked adjacent thereto".

The first amended answer was amended again, so as to set forth a third and a fourth affirmative defense to the first cause of action of the amended libel. Each of these additional defenses related to assumption of risk, and, in the Court's view of the evidence, need not be here set out further.

The United States, Williams-Dimond, and Moran filed a third-party libel against Stone, praying that the liability, if any, of those three respondents be decreed to be only secondary to that of Stone, and that contribution be decreed from the latter for any moneys paid by the third-party libelants, etc.

At the end of their opening brief, the libelants have subjoined the following "Addendum": "Mrs. Schwecke has been paid by the State Compensation Insurance Fund who was the carrier for the Workmen's Compensation for insurance for decedent up to August 14, 1950, at $25.00 a week, the sum of $6,050.00, and $200.00 for burial expenses. These payments continue at the rate of $25.00 a week until the total amount of $7500.00 has been paid, and the State Compensation Insurance Fund has a lien against any judgment in this case for such amounts as they have paid."

### 3. The Libelants' Version of the Substantive Facts.

For the purposes of this case, we may accept, with one or two modifications, the libelants' version of the substantive facts. It is in the interpretation of those facts, and in the inferences to be drawn from them, that the real controversy lies. A summary of the libelants' version follows:

It was raining for hours at a time during the day and night of Christmas Eve, 1945. The decedent was a guard working the night shift from 6 p. m. to 6 a. m., and was directly employed by Young's Patrol Service, of San Francisco, pursuant to an agreement with Moran. Under this agreement, Young furnished guards for the ships docked by Moran pursuant to the latter's

general agency agreement with the United States.

On this particular evening, Mr. Schwecke went on board the St. Simon in the Oakland Estuary, at about 6 p. m. It was his duty to guard the ship, keeping the gangplank in view. It was also his duty to go down the gangplank to the dock if he observed anything unusual on the dock, or if he had anything to report to his superiors concerning any occurrences on the St. Simon or on the Mata Gorda, which was tied next to it. If he wished, he might traverse the gangplank to the dock "to stretch his legs".

The dock was brilliantly lighted on the evening in question.

Mr. Schwecke disappeared shortly after conferring on the dock with Sergeant Carlson, his superior, a few minutes after either 8 or 9 p. m. He was last seen by Sergeant Carlson on the ship, taking his post at the head of the gangplank. Blair, the oiler, made his rounds every 15 minutes thereafter and would have seen the decedent had the latter been present for any length of time after 8 or 9 p. m. A watchman employed by Stone & Sons was stationed at the gate of the shipyard, which was the proper and normal means of exodus for any one leaving the shipyard. That watchman did not see the decedent leave through the gate.

Some time before 10:30 p. m., Mr. Schwecke was missed. A thorough search of the ship and of the adjacent waters failed to discover him. During this time the vessel was from five to seven feet away from the dock. The gangplank was at a fairly steep angle, ascending four or five feet from the level of the dock. It was slippery from the rain and the damp night air.

The two lower ropes running lengthwise of the gangplank were missing. The middle stanchion on the left, as one leaves the ship, was likewise gone. There was a two-foot gap between the head of the plank as it rested on the bulwark, and the nearest stanchions. An attempt had been made to close the gap on the right by stringing three loose ropes across it. No similar attempt was made on the left, even though the stepladder from the deck to the gangplank often faced to the left, and even though a block was often used in ascending from the deck to the gangplank, or in descending from the plank to the deck.

The gangplank moved across the dock parallel with the ship and away from it, depending upon the movement of the ship. The vessel surged and fell with the movement of the tide and with waves set up by passing ships, and the ship tilted away from the dock when it settled in the mud at low tide.

Mr. Schwecke's body was found on January 8, 1946—fifteen days after his disappearance—5200 yards, or about three miles, away from the St. Simon. The body was discovered "at a point where it might be expected to be found had he fallen into the estuary", if one considers the tide and the condition of the body.

### 4. The Libelants Must Establish a Causal Connection Between the Alleged Unseaworthiness of the Vessel and the Accident.

As we have seen, in their first cause of action the libelants have availed themselves of the option given to them by the Longshoremen's and Harbor Workers' Compensation Act, supra, and have elected to sue in admiralty. For their second cause of action, they are relying upon the Jones Act.

The libelants are not entirely accurate in their reliance upon the Jones Act, since it is well settled that that statute "applies only to vessels of private ownership or operation". "Commentary on Maritime Workers," by James Henry Willock, 46 U. S.C.A. pp. 211, 258. "When the vessel is 'owned by the United States or by any corporation in which the United States or its representatives shall own the entire outstanding capital stock, * * *' the rights under the Jones Act are enforceable by the Suits in Admiralty Act [46 U.S.C.A. § 741 et seq.]" Id., p. 258. See also Sevin v. Inland Waterways Corporation, 5 Cir., 88 F. 2d 988, 990.

The difference, however, is only a technical one, since even under the Suits in Admiralty Act, the suitor's rights are, as

we have seen, measurable by the terms of the Jones Act.

■ Be that as it may, however, under whatever statute the libelants may be able to sue, they must establish that the alleged unseaworthiness of the S. S. Simon, due to the condition of the gangplank, was the proximate cause of Mr. Schwecke's death.

From the frequent references to "proximate cause" in their briefs, it seems that the libelants concede that such a showing is required. Some doubt, however, as to their exact position in this regard is cast by their extensive quotation from Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 89, 93–99, 66 S.Ct. 872, 877, 90 L.Ed. 1099. On page 94 of 328 U.S., on page 877 of 66 S.Ct., the Court refers to the shipowner's liability as being "absolute", "a species of liability without fault," "neither limited by conceptions of negligence nor contractual in character". But there is nothing in the opinion to suggest that there need be no causal connection between the unseaworthiness and the accident. On the contrary, the Court, 328 U.S. on page 90, 66 S.Ct. on page 875, in a sentence not quoted by the libelants, explicitly states: "That an owner is liable to indemnify a seaman for an injury *caused* by the unseaworthiness of the vessel or its appurtenant appliances and equipment has been settled law in this country ever since The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760. Mahnich v. Southern S. S. Co., 321 U.S. 96, 99, 64 S.Ct. 455, 457, 88 L.Ed. 561, and authorities cited." (Emphasis supplied.) See also American Stevedores v. Porello, 1947, 330 U.S. 446, 459–460, 67 S.Ct. 847, 91 L.Ed. 1011.

■ The libelants have not cited any applicable statute, nor has this Court been able to find any, in which the ancient admiralty rule, authoritatively formulated half a century ago by Mr. Justice Brown in The Osceola, supra, 189 U.S. at page 175, 23 S.Ct. at page 487 of the opinion, has been changed in any way: "2. That the vessel and her owner are, both by English and American law, liable to an indemnity for injuries received by seamen *in consequence of* the unseaworthiness of the ship, or a failure to supply and keep in order the proper appliances appurtenant to the ship. [Case cited]" (Emphasis supplied.)

5. *The Libelants Have Not Established the Causal Connection Between the Alleged Unseaworthiness and the Accident.*

■ Even if we accept as correct the libelants' version of the basic facts—stripped of the inferences, conclusions, and arguments based thereon—it is the opinion of this Court that the libelants have failed to show a causal connection between the allegedly defective gangplank—the only arguable basis for the asserted unseaworthiness of the St. Simon—and Mr. Schwecke's fall into the estuary.

Too remote, both in space and in time, is the relation sought to be shown between the gangplank and the accident. As we have seen, Mr. Schwecke's body was discovered at a point three miles from the St. Simon, fifteen days after his disappearance. No one, of course, saw the accident, although the libelants tell us that the dock was "brilliantly lighted on the evening in question". No one heard an outcry or a splash, although it is not claimed that the dock was deserted.

According to the report of the autopsy surgeon, Mr. Schwecke was six feet tall and weighed 190 pounds. There were "no marks of violence" found on the body. There was nothing to indicate that Mr. Schwecke, in falling, had struck the "camel", a "raft-like affair" placed between the ship and the dock to keep the vessel from "banging up against the dock."

James Morris, second mate of the St. Simon, and the officer on watch during the night of December 24, 1945, stated in his deposition that, when he realized that the watchman was not on board, he "examined [the camel] and found no signs of any one having fallen over there * * *. Had any one or anything fallen on it, you would have been able to detect it, because it has that green marine moss growing over it."

It seems quite likely that a man of Mr. Schwecke's weight and size would have left some mark upon the camel, had he fallen into the space between the ship and

230

the dock. In any event, this feature of the case is worth considering in connection with the tenuous affirmative evidence adduced by the libelants on the subject of causation.

None of the cases cited by the libelants as to proximate cause involved facts disclosing links as flimsy and nebulous as those that we have here. In most of those cases, the victim's body was found at the scene of the accident, or there were other strong indications of the cause of death.

In this same connection, the libelants quote extensively from the opinion in Casey v. American Export Lines, 2 Cir., 173 F.2d 324, reversed on other grounds in 176 F.2d 337. The excerpt from the Casey opinion contains the following sentence quoted from Lavender v. Kurn, 327 U.S. 645, 653, 66 S. Ct. 740, 744, 90 L.Ed. 916, which at once distinguishes the instant case from the type there being considered: "And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable."

■ The problem before this Court is not whether the libelants have produced, in the language of Lavender v. Kurn, supra, "an evidentiary basis for the jury's verdict" that would, on appeal, be sufficient to sustain a judgment in their favor. This Court is not reviewing a jury's verdict, in which its function would be "exhausted" when an "evidentiary basis" became "apparent". This Court is itself the trier of fact, and must be convinced of the correctness of the libelants' claim by a preponderance of the evidence. To put it bluntly, the libelants have not come forward with such a preponderance.

Another fact, which has not yet been adverted to, further weights the scales against the libelants. That fact is Mr. Schwecke's state of intoxication on that Christmas Eve. This datum is important, not, as the respondents imply, on the question of contributory negligence, but on the point of whether he fell from the gangplank at all. If he did not fall from the gangplank, we do not reach the question of contributory negligence, because in that event the respond-

ents could not be charged with the causative primary negligence that, as we have seen, must be first established in order to hold them liable.

There is considerable testimony, which this Court believes, that Mr. Schwecke was intoxicated to such a degree that he might easily have fallen into the water from the dock or from some other point besides the gangplank. As we have seen, the libelants concede that he had freedom of motion, "to stretch his legs" and for other reasons.

Following are the steps by which Mr. Schwecke became thoroughly intoxicated:

L. L. Carlson, sergeant of the guard of the Young Patrol Service, Mr. Schwecke's employer, testified that he came upon Mr. Schwecke, who was smelling slightly of liquor, at the foot of the gangplank at about 10 minutes before 8 p. m. Sergeant Carlson warned the decedent not to take any more drinks that night.

Mr. Morris, the officer on watch, saw Mr. Schwecke standing in the crew's mess room at 9 o'clock. There were two oilers in the mess room at the time. An empty whisky bottle and an empty rum bottle were on the table. Mr. Schwecke smelled of liquor. Mr. Morris told him that he would have to go back to his station and stay out of the mess room, and not to do any more drinking.

Richard G. Blair, an oiler on board the St. Simon, saw Mr. Schwecke take several drinks of whisky in the mess room, which Blair visited from time to time during the evening, while making his rounds.

Blair was quite specific as to the progressive nature of Mr. Schwecke's intoxication that night: "* * * he was rather boisterous, and as the evening progressed he got considerably unstable and a little bit— well, slapping the boys on the back, kind of loud in general * * * unsteady * * * standing or leaning on somebody, or against the bulkhead most of the time * * * I remember his eyes were glassy that night."

■ A man in Mr. Schwecke's "unstable", "unsteady" and glassy-eyed condition might have toppled off the ship or off the dock into the water. The libelants can-

not logically seize upon the only arguably unseaworthy part of the vessel—the gangplank—and assert unqualifiedly that Mr. Schwecke fell from there. True, he *might* have fallen from the gangplank, just as he *might* have fallen from some other part of the ship, or from the dock. Such a contention is mere speculation; and speculation is not legal proof.

In Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 32–33, 64 S.Ct. 409, 411, 88 L. Ed. 520, the Court of Appeals reversed the judgment of the District Court after finding that, while there was evidence of negligence by the respondent, there was no substantial proof that the negligence was the proximate cause of death. The Supreme Court reversed the Court of Appeals, saying that, upon examination of the record, it could not say that the inference *drawn by the jury* that the respondent's negligence caused the fatal accident was without support in the evidence. But even in that appellate case, where—unlike here—every "reasonably possible" inference to support the jury's verdict must be indulged in, the Court referred to the salutary rule as to "mere speculation" that must govern *all* courts: "Petitioner was required to present probative facts from which the negligence and the causal relation could reasonably be inferred. 'The essential requirement is that mere speculation be not allowed to do duty for probative facts after making due allowance for all reasonably possible inferences favoring the party whose case is attacked.' [Cases cited.] If that requirement is met, as we believe it was in this case, the issues may properly be presented to the jury."

■ In the instant case, the libelants' contentions are not buttressed by a prior favorable verdict of a jury. This is a court of first instance, and the libelants must prove their case by establishing *probabilities*, not *possibilities*. They have not proved that the allegedly defective gangplank was probably the proximate cause of Mr. Schwecke's drowning.

### 6. Conclusion.

Accordingly, this Court holds that, the libelants having failed to sustain the burden of proving their case, the respondents are entitled to a judgment in their favor.

Findings of Fact and Conclusions of Law in conformity with Admiralty Rule 46½, 28 U.S.C.A., and this decision, approved as to form, will be signed upon presentation.