Petition of **MOORE–McCORMACK LINES, INC.**, as owner of **THE Steamship MORMACKITE**, for exoneration from or limitation of liability.

Claims by and on behalf of: **Harold H. Richardson, Edward T. Wall, Marvin Knieger, Richard B. Braithwaite, Lawrence Berk, Carmen Cadiz, Remy Rosario, Pedro De Jesus, Tadeo Del Valle, Shed Sullivan, Charles Henry, Miguel A. Hernandez, Charles Lee Williams.**

United States District Court
S. D. New York.
March 14, 1960.

---

588

Burlingham, Hupper & Kennedy, New York City, for petitioner. Eugene Underwood, John J. Crowley, James W. Lynch, William M. Kimball, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for Richardson and Wall claimants. John J. Martin, John L. Quinlan, New York City, of counsel.

William Kapelman, New York City, for Knieger claimant.

Lee Pressman, New York City, for Berk claimants. Standard, Weisberg, Harolds & Malament, Louis Harolds, New York City, of counsel.

Shafter & Shafter, New York City, for Braithwaite claimants. Alfred M. Shafter, Jack Steinman, New York City, of counsel.

Joseph Friedberg, New York City, for Cadiz claimants. Bernard Rolnick,

Robert H. Kilroe, New York City, of counsel.

Bernard Rolnick, Robert H. Kilroe, New York City, for claimants Rosario, De Jesus, Del Valle, Sullivan, Henry, Hernandez and Williams.

McGOHEY, District Judge.

Thirteen claims filed in this proceeding are here considered. They seek damages for death and personal injuries for which the petitioner has been held liable without limitation.[1] They were tried together pursuant to stipulation. Six are by representatives of deceased crew members. Seven are by survivors.[2] The Court's findings and conclusions appear in the following opinion. Matters common to all will be considered before taking up the individual claims.

Neither of the vessel's two lifeboats was lowered before she sank at 9:45 A.M. on October 7, 1954.[3] The men entered the water about 9:30 A.M. Its temperature was about 65°. Each man was wearing a life jacket over his work clothes.

The waves were then about 10 to 12 feet high and continued so until sunset at 5:30 P.M. Thereafter they gradually became lower. They were only about 4 to 5 feet high on Friday and also on Saturday morning when the survivors were picked up.

The men quickly swam away from the vessel. After she sank, dunnage, hatch boards, doors and other pieces of wood were washed up. The men got hold of these and either lay or hung on to them to keep afloat. At first they were in one large group. Later they broke up into smaller groups and several men went off by themselves. No distress call had been sent by the vessel's radio.[4] Accordingly ships which the men saw passing at a distance on Thursday afternoon and night and again on Friday were not looking for them.[5] And although they called out, their voices did not carry to the ships.

There was at least one shark, and probably more, in the general area where the men were on Thursday and Friday. It is conceded that one man "bled to death in eight or nine minutes" after he was attacked by a shark on Thursday evening.[6] It was light enough for this attack to be observed by at least two of the survivors, Davis and Rosario. I find it occurred at about 7 P.M. A second man, unidentified, was bitten by a shark about 9 A.M. on Friday. This attack was seen by Rosario. Toothmarks 9 inches in diameter were found on chief officer Richardson's body which was recovered. The medical examiner at Norfolk, Va. "presumed," quite reasonably it would seem in the circumstances, that these were made by a shark. I find they were.

All of the survivors were weak and weather-worn when they were taken from the water at various times on the morning of October 9. They had been without food or drink for from 46 to 50 hours; their eyes and throats were irritated by the salt water; the rubbing of their life jackets and of the boards they hung onto caused multiple abrasions of their chests, arms and legs; until rescued they all feared for their lives. It is a reasonable assumption that, up until he died, each deceased suffered similarly. I find he did. I find further that $300 is fair compensation for each hour of conscious pain and suffering endured by each man while in the water.

Findings as to what additional awards should be made to any survivor for al-

1. 164 F.Supp. 198; affirmed 2 Cir., 272 F.2d 873, decided Nov. 30, 1959.

2. The total number of claims filed for death and personal injuries was 48. Of these 21 were settled before, and 14 during, trial.

3. See 164 F.Supp. 217.

4. See 164 F.Supp. 205.

5. The search which resulted in the rescue of the survivors on Saturday was probably not started until after the vessel failed to report at Baltimore where she was due on Friday.

6. The concession appears in Petitioner's Ex. 14. The claim for this man's death was settled before the trial of the instant claims.

leged permanent injuries resulting from the sinking will be deferred until their individual claims are considered.

The logs of the rescue vessels recorded the various times when each survivor was picked up. Accordingly there is no dispute as to the number of hours each of them actually was in the water. There is, however, no evidence as to how long each deceased actually remained alive. No witness saw any of them die. And, although the time when each was last seen alive is known with reasonable certainty, that obviously cannot be taken as the time of his death; for it would be absurd to find that a man was dead at a time when the uncontradicted evidence shows he was in fact alive. Then, too, while it is possible that of those last seen alive at about the same time, some died sooner than others, the evidence furnishes no basis whatever for distinction. In such circumstances one is forced to estimate the time of death. Mine is that each deceased died one hour after he was last seen alive, and I find accordingly.

### Richardson Claim

Harold R. Richardson was the chief officer of the vessel. He left the vessel without physical injury. His body, still clad as when he entered the water, was recovered some time on October 9 and brought to Norfolk, Virginia, The following day the medical examiner there certified the cause of death as "accidental drowning due to submersion due to vessel sinking at sea"; and the time of death as "approximately 10 A.M. on the 7th."

He left surviving two infant daughters and their mother, Jean O. Richardson, his widow and executrix, who makes this claim on behalf of herself and their two children.

The examiner was not called as a witness and the evidence before me furnishes no support whatever for his finding as to the time of death. Several survivors swore without contradiction that they saw Richardson alive after sunset which occurred about 5:30 P.M., and one, Rosario the bo'sun, added that he and Richardson were together throughout the night of the 7th and until about 9 A.M. on the 8th. That was twenty-three and one-half hours after the sinking. In pre-trial testimony Rosario had said they had been together about "16 or 17 hours," which would have been about 2 or 3 A.M. on the 8th. He was closely questioned about this variance and said he could not remember giving the earlier testimony. However, it seems to me probable that his trial testimony is more accurate. It is conceded that sunrise on the 8th did not occur until 6 A.M. This was twenty hours after the sinking. Rosario testified that on that morning Richardson and he, accompanied by a seaman he could not identify, left a group they were in and started what proved to be a futile attempt to swim to a distant vessel. While Rosario did not fix the time when this occurred, it is unlikely that such an attempt would have been made in darkness when their chances of being observed would have been very slight.[7] Rosario insisted there was a very bright sun when they abandoned their attempt and Richardson left him and swam back to the group, which Rosario saw him reach. It is, of course, impossible to be sure that Rosario's recollection of the time of these events was better at the trial than when he gave his deposition. However, he impressed me as trying to be fair and truthful in his trial testimony as to the time of these events and it accords with the probabilities. Moreover this did not materially advance his own interests and he certainly was not shown to have any motive to fabricate in favor of Richardson's family. His trial testimony as to the time he last saw Richardson alive is accepted. Accordingly the medical examiner's finding as to the time of death is rejected. Richardson was last seen alive by Rosario at 9 A.M. on the 8th. I find he died at 10 A.M. on October 8th; twenty-four and one-half hours after he entered the water.

7. See par. Third of the petition herein quoted in 164 F.Supp. at 200, 201.

It was stipulated that the medical examiner, if called, would testify in accordance with a letter he sent to Mrs. Richardson on December 27, 1954, which was received in evidence. In it he said his examination of Richardson's body disclosed "a ring of toothmarks on the right thigh and buttock 9 inches in diameter, but they only penetrated the skin. No skin, or muscle, was missing, and I presume this was done by a shark through the clothing. It is impossible for me to say if this was done before or after his death." If Richardson had been attacked during the twenty-three and one-half hours he was with Rosario, it is altogether unlikely the latter would have failed to relate this either in his pre-trial or trial testimony. He did neither; and this can hardly be attributed to inadvertence or forgetfulness. He related two instances of attacks on other men. I find that Richardson was not attacked before 9 A.M. on the 8th. The question remains whether he was attacked between then and 10 A.M. when he died. If he had been attacked while alive, it is certainly reasonable to suppose he would have made some struggle with a resulting tearing of his flesh. But the flesh was not torn. Accordingly I find that the attack occurred after his death and that death resulted from drowning.

Richardson's widow, whose testimony on this point was unchallenged, said he was a devoted husband and father. Other unchallenged evidence supports her. He acquired his own house in 1951 and thereafter improved it. He maintained a car for his family. He regularly brought them gifts from the foreign countries he visited on his voyages. While at home between voyages and during his annual vacations he spent most of his time with his wife and children. I find he was a devoted husband and father.

Richardson's professional career, of which all but about six months was spent in the service of the petitioner, was one of steady advancement. In June, 1942, at the age of 19, he was graduated from Admiral Farragut Academy. In January, 1944, he was graduated from New York State Maritime Academy and commissioned as Ensign in the United States Naval Reserve. Within two months of his second graduation he sailed as Third Mate on a United Fruit Company cargo vessel; and nine months after that graduation he received his certificate as a Second Mate and entered the petitioner's employ as a Second Mate. He served in that grade until the following July when he received his certificate as Chief Mate. Thereafter he regularly sailed in that capacity on the petitioner's vessels until December, 1946. He married in June, 1945. In December, 1946 he secured employment ashore. This proved unsatisfactory and in May, 1948 he returned to sea in the petitioner's employ as a Third Mate and served in that grade until September, 1949. Thereafter until his death in October, 1954, except for one period of six weeks when he sailed as Second Mate, he never served in a grade lower than Chief Mate on cargo vessels. And for about one year he was Executive Officer, or Staff Captain, on one of the petitioner's passenger vessels, a position of professional prestige. The petitioner's personnel file on Richardson records the high opinions regularly expressed by the Masters under whom he served, as to his character, personality and professional competence. These Masters repeatedly rated him qualified for command.

Prior to January, 1957, Masters of the petitioner's vessels were appointed by the then Marine Superintendent Captain Furey, on recommendation of the then Assistant Marine Superintendent Captain Mayo. The latter testified that Richardson was an "excellent" ship's officer. The petitioner's president in a letter to Mrs. Richardson shortly after Richardson's death described him as "one of the family" who had "carved for himself a distinguished record winning the respect and admiration of all with whom he came in contact"; whose "loss is a terrible blow to all of us."

Since 1957 the present Marine Superintendent, Mr. O'Brien, makes the promotions to Master from those recommended by a board of three company officials of whom the present Assistant Marine Superintendent Captain Barrett is one. Mr. O'Brien testified that it was impossible to say whether Richardson would ever be promoted to Master. Captain Barrett, however, a former Master of wide experience in command of vessels which Mr. O'Brien is not, thought much better of Richardson's chances of promotion. Though obviously reluctant to disagree with his superior, the most he would say in support of Mr. O'Brien's opinion was that, in his own opinion, Richardson "would probably not have come up for selection to Master in less than 4 or 5 years" after 1954; that is, in 1958 or 1959. Moreover he thought it more likely than not that Richardson would become a Master. Mr. O'Brien's opinion is at odds with all the evidence as to Richardson's education and rapid promotion, the high recommendations of all the Masters under whom he served and the high opinion of the petitioner's president. Like Mr. O'Brien, Captain Barrett was obviously at pains, as far as his oath permitted, to protect his employer's interest throughout this proceeding. Accordingly his favorable opinion of Richardson's prospects is quite significant. It, together with all the other evidence, persuades me that if Richardson had lived he would, in all probability, be promoted to Master not later than 1963, and I find accordingly. He would then have reached the age of 40.

Whether, as the claimant urges, Richardson also would achieve command of passenger ships and the higher wages of that position, cannot be determined on the evidence before me. It was shown that after a year as Executive Officer on a passenger vessel he was reassigned as Chief Mate of cargo vessels. Captain Barrett at that time thought Richardson lacked sufficient experience to warrant his continued assignment as Executive Officer on passenger vessels. This opinion is indeed inconsistent with the reports of Captain Hodges under whom Richardson served on the passenger vessel. Nevertheless Barrett was then the official responsible for the selection and assignment of deck officers below the grade of Master and I think his judgment is entitled to greater weight than that of Captain Hodges who did not have that responsibility. Service on passenger ships is more desirable and prestigious than service on cargo vessels and so, it is altogether unlikely that, as proctors for Mrs. Richardson suggest in their brief, Richardson's reassignment to cargo vessels was at his own request. I find the claimant's evidence insufficient to support a finding that Richardson would be promoted to Master of passenger vessels.

Richardson at his death had a life expectancy of 39.36 years according to the United States Life Tables 1949–1951. His work expectancy, however, was only 33 years; that is until age 65. While it is true that some active Masters are older than that, they constitute only a very small percentage of the total number of active Masters.[8] Accordingly I find 33 years to be the period after 1954 that Richardson if he had lived could reasonably have expected to serve as a ship's officer.

The claimant's proctors argue that if he had lived, Richardson could reasonably expect to secure gainful employment ashore after he reached the age of 65; and that an award should be made for the pecuniary benefits his widow could expect to receive from his earnings ashore. The record, however, furnishes no basis whatever for such an award. It could at best be only a guess. There is no evidence as to what job opportunities, if any, are available for Masters retired for age; or what salaries are

8. See Petitioner's Ex. 47, "Survey of Licensed Officers of the American Merchant Marine." This is a study made and distributed by the U. S. Department of Commerce Maritime Administration in 1958.

received by those, if any, who are employed.

Richardson's total earnings during the three years prior to his death averaged $10,000 per year. His total Federal and State income taxes amounted to $1,500 per year, leaving $8,500 for himself, his wife and their two children.[9] One-fourth of this, $2,125, is fairly attributable to his personal expenses and his share of the usual household expenses.[10] Thus I find that the pecuniary benefits accruing to his wife and children amounted to $6,375 per year during three years prior to his death.

I find that the same amount would have been available to the wife and children each year thereafter through 1962, a period of eight years, while he would be serving as Chief Mate of a cargo vessel. Since the first five years of this period, from 1954 through 1959, have already elapsed, the beneficiaries have already suffered a loss of $31,875.[11]

I find that their annual loss for each of the three following years, 1960 through 1962, will also be $6,375.[12]

I find that Richardson's annual earnings as a cargo Master would be $15,000.[13] This then is the annual salary he would receive during the period commencing in 1963 and continuing through 1987, the end of his work expectancy as a ship's officer. The amount annually available for his wife and children would vary during different portions of that period. Each of his children would reach the age of 21 years in a different year during the period and this happening would increase both the amount of his income taxes and the amount fairly to be attributed to his personal expenses and his share of the household expenses.[14] His older daughter, Barbara, will become 21 in 1968. His younger daughter, Gail, will become 21 in 1971. I find that in each of the years 1963 through 1968, after deducting from gross earnings estimated Federal and State income taxes amounting to $2,700, and one-fourth of the balance as attributable to Richardson, the amount available for his wife and two children would be $9,225.

I find that in each of the years 1969 through 1971, after deducting estimated Federal and State income taxes amounting to $3,000, and one-third of the balance as attributable to Richardson, the amount available for his wife and younger daughter would be $8,000.

I find that in each of the years 1972 through 1987, after deducting estimated Federal and State income taxes amounting to $3,450, and one-half of the bal-

9. In O'Connor v. United States, 2 Cir., 269 F.2d 578, it was held that Federal income taxes must be deducted from gross earnings, and that, of the remainder, a proportionate share should be attributed to the deceased's expenses. While State income taxes were not mentioned, there seems no reason, in principle, why the amount of these which, like the amount of Federal income taxes, is never available to the beneficiaries, should not also be deducted in ascertaining their pecuniary loss. Richardson's tax returns were not produced. The sum of $1,500 has been arrived at by computing the tax due at current rates on Richardson's gross earnings less the exemptions permitted a married man with two children and the "standard deductions" permitted in place of detailed deductions. The same method of computation has been followed in estimating future income taxes.

10. Mrs. Richardson estimated that the deceased "kept for himself" only about $1,600 per year. She did not, however, assign any amount to his share of the usual household expenses.

11. This amount is not to be discounted. See Holliday v. Pacific Atlantic S.S. Co., D.C., 117 F.Supp. 729, 733; affirmed 3 Cir., 212 F.2d 206.

12. The finding as to the present value of this and the remaining items of future pecuniary losses through 1989, is deferred until after consideration of the latter.

13. This is the current rate. It may indeed be increased in future years, as was urged; but when or by what amount it would be increased is sheer speculation because there is no reliable evidence in the record on this.

14. See O'Connor v. United States supra.

ance as attributable to Richardson, the amount available for his wife would be $5,775.

I find that the present value of the future pecuniary benefits which his wife and children would have received out of the deceased's earnings during the years 1960 through 1987, discounted at 4%, is $118,296.[15]

Each of the children has lost the nurture, guidance and training she would have received from her father until she reached her majority. I find that a fair value for such nurture, guidance and training is $1,000 per year for each child. Therefore each has already sustained a loss of $5,000.

Barbara will suffer a further loss of $1,000 per year during the nine years 1960 through 1968, the present value of which, discounted at 4%, is $7,440. Accordingly Barbara's total loss on account of nurture, guidance and training is $12,440.

Gail will suffer a further loss of $1,000 per year during the twelve years 1960 through 1971, the present value of which, discounted at 4%, is $9,400. Accordingly Gail's total loss on account of nurture, guidance and training is $14,400.

The amount due for the deceased's conscious pain and suffering is $7,350.

■ The foregoing items of damage are recapitulated as follows:

| | |
|---|---|
| Deceased's conscious pain and suffering | $ 7,350. |
| Pecuniary benefits from earnings already lost | 31,875. |
| Present value of future lost benefits from his earnings | 118,296. |
| Barbara's total loss of nurture, etc. | 12,440. |
| Gail's " " " " " | 14,400. |
| Total Losses | $184,361. |

---◆---

■ This amount must be reduced by $5,500 which Mrs. Richardson concededly received under a Second Seaman's War Risk policy, all of the premiums on which were paid by the petitioner.[16]

■ Proctors for the petitioner also urge deduction of a further "setoff" of $200. Mrs. Richardson, within a short time after the disaster when she was "short of cash," did indeed receive that amount from the petitioner. She admitted signing a receipt for it but she kept no copy of this and could not recall its provisions. The petitioner, who presumably has it, did not produce it and introduced no evidence of its provisions. However, it seems altogether unlikely

that the petitioner, who later filed a cross-libel against Richardson's estate for the loss of the vessel and all awards the petitioner might be required to pay on account of the sinking, would specify in the receipt that the $200 was a payment on account of any award Mrs. Richardson might recover for her husband's death. A more likely explanation of the payment and one more consonant with the letter Mrs. Richardson received from the petitioner's president is that it was a gift in time of their need to the widow and children of "one of the family * * * [whose] loss was a great blow to all of us." I find the $200 was a gift and not a payment on account. Accordingly the claimed "setoff" is disallowed.

15. For the use of the 4% rate, see Alexander et al. v. Nash-Kelvinator Corp., 2 Cir., 271 F.2d 524.

16. See Lawson v. United States, 2 Cir., 192 F.2d 479; O'Connor v. United States, supra; Burch v. United States, 4 Cir., 261 F.2d 418.

A decree for $178,861. with interest from the date of the decree [17] may be submitted on five days' notice.

### Wall Claim

Edward T. Wall was the Chief Engineer of the vessel. He did not survive the sinking. He left three minor children and their mother, Luisa Wall, his widow and administratrix, who makes this claim on behalf of herself and their three children.[18]

Wall entered the water wearing a life jacket over his work clothes. He was then bleeding from a cut on his face. This seems to have been only a superficial wound which, in any event, was not disabling. The uncontradicted evidence shows that he survived longer than any of the other deceased of whom we have any knowledge. He was last seen alive at about 11:30 A.M. the day following the sinking. I find he died that day at 12:30 P.M., after twenty-seven hours in the water. There is no evidence that he was attacked by sharks.

He entered the petitioner's employ as a Third Assistant Engineer in 1943. He was then only 23 years of age. By the time he reached the age of 30, seven years later, he was licensed and sailing as a Chief Engineer on the petitioner's cargo vessels. In November, 1950 he left the petitioner's employ and took his family to live in Mexico, his wife's native country. He was unsuccessful in obtaining sufficiently remunerative employment there and returned to the petitioner's employ in November, 1951 as a Chief Engineer. Once again, in February, 1952, he tried shoreside employment. This too, proved financially unsatisfactory and after seven months he returned to sea as Chief Engineer on the petitioner's cargo vessels. He continued to work in that capacity until his death.

Mr. Glennon, the petitioner's Superintendent of engineering personnel, testified that in his opinion Wall was "an extremely competent engineer." Indeed, in a letter to Mrs. Wall shortly after the sinking, he described Wall as "one of our most outstanding engineers [whose] attention to duty was of the highest [and whose] untiring efforts [made] the ships on which he sailed as Chief Engineer and 1st Asst. Engineer * * * of very high caliber in the Engine Department." The petitioner's president, in a letter to Mrs. Wall, described her husband as "one of the outstanding Engineers in our Fleet." There is no doubt that the petitioner would have continued to employ Wall as a Chief Engineer of its cargo vessels.

Wall was 34 years old when he died. His life expectancy, according to the United States Life Tables 1949–1951, was thirty-seven and one-half years. However, his work expectancy as a Chief Engineer at sea was shorter, probably only 31 years; that is, until he reached age 65. There are, it is true, some older Chief Engineers sailing but they are so few as to be notable exceptions.[19]

Proctors for the petitioner argue that Wall's work history indicates that he was anxious to leave the sea; that if he had lived he would, in all likelihood, do so long before he reached age 65; and that his earnings ashore would be less than if he remained at sea. To me, however, his employment history shows rather that, while he undoubtedly had the desire to lead a normal home life ashore, he was unwilling to satisfy it at his family's expense. Thus when his efforts to indulge his preference resulted in failure to earn enough to support his family, he returned to sea where he could earn enough. There is nothing in the evidence

---

17. In Stiles v. National Airlines, Inc., 5 Cir., 268 F.2d 400, certiorari denied Nov. 9, 1959, 361 U.S. 885, 80 S.Ct. 157, 4 L.Ed.2d 121, interest was allowed from the date of death. The decisions in this circuit, however, are to the contrary. See Casey v. American Export Lines, 2 Cir., 173 F.2d 324, 326.

18. Juan, the oldest child, was the issue of Mrs. Wall's prior marriage which ended in divorce. He was accepted and supported by the deceased as one of his own children.

19. See Petitioner's Ex. 47, "Survey of Licensed Officers of the American Merchant Marine."

to show that this situation would change in the future. I find that if he had lived, Wall would continue to serve as a Chief Engineer of cargo vessels for 31 years, that is, until 1985.

Proctors for Mrs. Wall argue that he had every reasonable expectation of being promoted to passenger service at a higher salary than he would earn in cargo vessels. The argument must be rejected because whether or when he might be so assigned is sheer speculation. There is no evidence that he ever served on passenger vessels. Neither is there any evidence as to what standards are applied in selecting Chief Engineers for passenger vessels; or whether Wall did or could meet such standards.

The claimant's proctors also argue that if Wall lived he could reasonably expect to be employed ashore after he reached age 65 with corresponding benefits to his wife, for the loss of which she should be compensated. This argument also is rejected. Here again, as in the case of Richardson, there is no evidence as to Wall's possible job opportunities or income. Any award would necessarily be a mere guess.

The widow's uncontradicted testimony, which I accept, was that Wall was a devoted husband and father. I find accordingly. At his death the children's ages were: Juan 16; Silvio, 10; Maureen, 3. Each of these has lost, for the period of minority, the deceased's nurture, care and training, the value of which I find to be $1,000 per year per child. Each child, therefore, has already lost $5,000.

Juan became 21 in 1959. Accordingly he will not suffer loss of nurture, etc. in the future.

Silvio will not become 21 until 1965. His loss will be $1,000 per year for the next six years, the present value of which, discounted at 4%, I find to be $5,240. His total loss on account of nurture, etc. is $10,240.

Maureen will not become 21 until 1972. Her loss will be $1,000 per year for the next 13 years, the present vaue of which, discounted at 4%, I find to be $10,000. Her total loss on account of nurture, etc. is $15,000.

The undisputed evidence is that during the years 1953 and 1954, Wall's earnings averaged $11,366 per year.

I find that in each of the years 1955 and 1956 his earnings would have been at least $11,366; that his annual Federal and State income taxes would have totaled $1,798, leaving net earnings of $9,568; that one-fourth of this amount or $2,392 would have been used for his personal expenses and his share of ordinary household expenses;[20] leaving for his wife and three children the sum of $7,176 per year.[21]

It was stipulated that in 1957 the wage rate for Chief Engineers was increased. I find that in each of the three years 1957 through 1959, Wall's earnings would have been $14,100; that his Federal and State income taxes would have been $2,165; that his net earnings would have been $11,485, of which one-fourth or $2,871 would have been used for his personal expenses and his share of usual household expenses, leaving for his wife and three children $8,614.

Wall's wife and children, therefore, have already lost a total of $40,194.[22]

I find that in each of the twenty-six years 1960 through 1985, the end of Wall's work expectancy, his annual earnings would be $14,100.[23]

I find that in each of the six years 1960 through 1965, Wall's annual Federal and State income taxes would be $2,856, leaving a net income of $11,244,

20. Mrs. Wall's estimate of $1,400 to $1,600 as the deceased's personal expenses made no allowance for his share of household expenses.

21. Income taxes have been estimated according to the same formula used for Richardson. See note 9 supra.

22. This amount is not to be discounted. See note 11 supra.

23. There is no basis in the evidence on which to predict whether or when or by how much, the 1957 rate for Chief Engineers might be increased during this period.

of which one-fourth or $2,811 would be used for his share of household expenses and his personal expenses. Thus the amount his wife and two minor children could reasonably expect for their use in each of the six years is $8,438.[24]

I find that in each of the seven years 1966 through 1972, Wall's Federal and State income taxes would be $3,057, leaving a net income of $11,043, of which one-third or $3,681 would be used for his personal expenses and his share of household expenses. Thus the amount his wife and one remaining minor child could reasonably expect for their use in each of these seven years is $7,362.

I find that in each of the thirteen years 1973 through 1985, Wall's Federal and State income taxes would amount to $3,261, leaving a net income of $10,839, of which one-half or $5,419 would be used for his personal expenses and his share of household expenses. Thus the amount which his wife could reasonably expect in each of those thirteen years is $5,420.

I find that the present value of the losses from earnings for the years 1960 through 1985, discounted at 4%, is $111,625.

■ The foregoing items of loss, recapitulated, are as follows:

Deceased's conscious pain and suffering .......... $ 8,100.
Pecuniary benefits from earnings already lost .... 40,194.
Present value of lost benefits from future
 earnings ................................... 111,625.
Juan's total loss of nurture, etc.................. 5,000.
Silvio's " " " " " ................. 10,240.
Maureen's " " " " " .............. 15,000.
 Total Losses ....... $190,159.

The petitioner claims no setoff against any award on this claim.

A decree for $190,159 with interest from the date of the decree[25] may be submitted on five days' notice.

### Knieger Claim

Marvin Knieger was the radio operator on the vessel. He did not survive. He was unmarried. He left his mother who, at his death, was 71 years of age, and a brother, Bernard. The latter, as administrator, makes this claim, solely on behalf of the mother, for the deceased's conscious pain and suffering and the pecuniary loss she has already sustained and will sustain in the future.

Knieger was 27 years old at the time of the disaster. He entered the water wearing a life jacket over his work clothes. His body was not recovered. He was last seen alive at 7 P.M. on the day the vessel sank. I find he died at 8 P.M. on that day, after ten and one-half hours in the water.

The deceased's life expectancy was 43 years according to the United States Life Tables 1949–1951. At that time his mother's life expectancy, according to the same table, was 12 years. The deceased's work expectancy was undoubtedly less than his life expectancy, but it is unnecessary to determine by how much since his mother surely would not survive throughout his working life.

Mrs. Knieger concededly received support from the deceased from 1951 up to the time of his death. Since the spring of 1953 she has been, necessarily, confined to a nursing home. Her expenses there in 1953 amounted to approximately $3,700, all of which were paid by the deceased. Since his death her expenses

24. This and other future losses will be discounted.

25. See note 17 supra.

have been paid out of funds in the deceased's estate and the proceeds, amounting to $10,500, of two insurance policies on his life, of which she was the beneficiary. The deceased's brother Bernard testified that he had never contributed to his mother's support and there is no reason to doubt his testimony which was not contradicted.[26]

Mrs. Knieger's expenses since 1954 have increased each year. The average for 1958 and 1959 was about $4,500; and it appears that her future maintenance cost per year will be the same.

The deceased was undoubtedly a dutiful son and would have continued to be such if he lived. But it is altogether unreasonable to suppose that he would have continued to bear the total expense of his mother's care after his brother Bernard began to earn regular income as a college professor. The deceased, after all, did not have, nor could he reasonably expect to have, unlimited income; and $4,500 is far more than half of what he would have available, after taxes, from his salary of about $7,200 as a ship's radio operator. Though Bernard is married, he has no children. He impressed me as a man of honor, and altogether unlikely to refuse assistance in caring for his invalid mother. It is reasonable, therefore, to assume that in 1960 and thereafter until his mother's death he would contribute at least one-third of the cost of her support, that is $1,500 per year. I find accordingly. That would leave $3,000 per year to be paid by the deceased. I find the latter amount to be what he would contribute annually if he lived, throughout his mother's life expectancy.

The cost of Mrs. Knieger's care for the period 1955 through 1959 was approximately $20,000. I find that if he had lived the deceased would have paid that.

Accordingly, his mother has already lost that amount.[27]

As already noted, her life expectancy when her son died was 12 years. Five years of that period have already passed. Accordingly her future losses will be computed on the basis of an expectancy of seven years. It is argued that as of February, 1959 she had an expectancy of 9.2 years and that this period should be used. I find that the seven-year period is more appropriate in view of the present state of Mrs. Knieger's health. She requires regular medical care, nursing and medication. She is no longer able to go out of the nursing home. She was too feeble to come to court to testify.

■ I find that if the deceased had lived his mother could reasonably expect to receive from him in 1960 and annually thereafter through 1966 the sum of $3,000. I find that the present value of these future contributions, discounted at 4%, is $18,000.

The foregoing items of loss, recapitulated, are as follows:

Deceased's conscious pain and
 suffering ................... $ 3,150.
Contributions already lost ..... 20,000.
Future contribution—present
 value ..................... 18,000.

 Total Losses .... $41,150.

From this must be deducted the sum of $5,500, the proceeds of a Second Seaman's War Risk policy which, concededly, were received by Mrs. Knieger. All premiums on this policy were paid by the petitioner.[28]

A decree may be entered on five days' notice for $35,650 with interest from the date of the decree.

### Braithwaite Claim

Richard Braithwaite, an ablebodied seaman, was one of the crew who did not

---

26. Bernard is presently a member of the English faculty at the University of Wisconsin. He did not begin his teaching career until 1953. Prior thereto he was a student at various universities working for undergraduate and graduate degrees, the last of which, Ph.D., he received in 1952.

27. *This amount is not to be discounted.* See note 11 supra.

28. see note 16 supra.

survive. His widow, the administratrix of his estate, makes this claim on behalf of their son, herself and the deceased's mother. At his death the deceased was 53 years old and the ages of his son, his widow and his mother were, respectively, 26, 49 and 77 years.

Braithwaite left the vessel without physical injury, wearing a life jacket over his work clothes. He was last seen alive about 6 P.M. that day. I find he died one hour later, after nine and one-half hours in the water. There is no evidence nor is it claimed that he was attacked by a shark or otherwise physically injured during that time.

There is no evidence that he had any prospect of becoming a licensed officer. His life expectancy, according to the United States Life Tables 1949–1951, was 19 years. He would then be 72 years old. His work expectancy as a seaman was certainly less than that. Although he was in good health, a steady worker and a man of good habits, it is altogether unlikely that he could have continued to do the laborious work of an ablebodied seaman until he reached the age of 72 years. Moreover, he was looking forward to leaving the sea. His widow testified that he "promised" to do so "soon." There is, however, no evidence as to how long he meant by "soon." He first went to sea in 1942 when he was 41 years old. He had then been married for 18 years and had a son 14 years old. Prior to going to sea he had worked as an automobile mechanic in a public garage. It is certainly a fair inference that, at 41, a good father and husband, he gave up a normal home life and went to sea only because it offered the chance of greater earnings than he was able to command ashore. There is no reason to suppose that he could, in 1954 or at any time thereafter, earn more or even as much ashore as he could at sea; or that, despite his desire to live at home, he would give up his greater earnings as long as he was able to do the work of a seaman. Sea service offered his best chance to save for the comfort and security of life ashore. Accordingly, I find he would have con-tinued to work at sea until he reached age 65 in 1966, but not thereafter. He would then be eligible for Social Security benefits. Whether he could then obtain gainful employment ashore and, if so, what he might then be able to earn are too speculative to justify a finding.

The deceased was no doubt devoted to his mother, his wife and his son. But, as will appear, he could not possibly have given them as much money as they claim.

The son concededly received no allotments from the deceased's wages. The latter, however, did make such allotments to his wife; and beginning in 1951, to his mother as well. Furthermore, in 1951 he opened a savings account in his name "in trust for" his wife. She was paid the balance on deposit at his death. This account was opened with a deposit of $527.93. Each year thereafter until his death he made additional deposits in substantial amounts. In 1952 he made one deposit of $1,250; in 1953, four deposits aggregating $2,300; in 1954, three deposits aggregating $935. The widow never made any deposits in the account and, during the deceased's life, no moneys were ever withdrawn from the account.

The allotments paid to the mother were: in 1951, $410; in 1952, $475; in 1953, $425; in 1954, up to October, $480. The allotments to the widow were: 1951, $1,045; 1952, $660; 1953, $875; 1954, up to October, $960.

The mother testified that in addition to the allotments, the deceased, each year, gave her not less than $200 of which half was cash and half gifts in kind.

The widow testified that the deceased supplemented his allotments to her with cash and "travellers checks" sent from his ports of call, which brought the amount she regularly received from him up to $200 per month.

The son was married in 1952. Both he and his wife were then, as they now are, elementary school teachers in the New York City Public School System. Their only child was born in 1953. The son testified he received $250 from his father at the time of his wedding, $50

per month in 1953, and in 1954, up to his father's death, $35 per month.

This testimony as to gifts and cash contributions over and above the allotments, if credited, would lead to absurd results. There is no evidence that the deceased had any income other than his wages as a seaman. In 1951 his net earnings after taxes concededly amounted to only $4,363. The total of his proven deposits and allotments and the claimed gifts and cash contributions that year is $3,538. Thus, according to the testimony, he had for his personal expenses in 1951 only $825; something less than $16 per week. In 1952 his conceded net earnings after taxes were $3,982. The total of his proven deposits and allotments and claimed cash contributions and gifts in that year is $4,575. Thus, according to the testimony, he not only had nothing for himself in 1952 but went into debt for $593. In 1953 his conceded net earnings were $5,911. The total of his proven bank deposits and allotments and claimed cash contributions and gifts in that year is $5,925. Thus in this year also he had nothing for personal expenses and increased his debt by $14. In 1954 his conceded net earnings amounted to $4,074. The total of his proven bank deposits, allotments and claimed cash contributions and gifts in that year is $3,734. Thus the amount available for his personal expenses in that year was only $394; about $10 per week. There is no evidence that, at his death, he was in debt. Accordingly, the testimony as to gifts and cash contributions to the widow and the mother must be greatly discounted. The testimony that the son received regular allowances in 1953 and 1954 is rejected.

The constancy with which the savings deposits were made supports a part of the widow's testimony which I accept that the deceased's purpose in making them was to accumulate enough money to make a substantial payment on a home. I find he was saving for that purpose. It is a fair inference and I find that, had he

lived, he would have continued to do so until he accumulated $12,500; that his deposits would probably continue, as before his death, to average about $1,250 per year; and that he would have deposited that amount in each of the years 1955 through 1959.

The widow contends that the whole of the deposits in those years would have been additional contributions to her; and that she should be awarded an equivalent amount for their loss in addition to her other claimed losses. The theory underlying this contention is that the deceased, during his life, established the savings account as an irrevocable trust of which she was the sole beneficiary. It is clear, however, that he did not do so formally. He retained sole power to draw against the funds on deposit and to dispose of, as he pleased, the whole balance in the account or any part he might have withdrawn. There is no evidence that he manifested any intention to establish an irrevocable trust in her favor during his life. Her testimony certainly does not, as contended, show that this was his intention. Indeed it tends rather to show the contrary. According to her, the home he was saving for was to be for himself as well as her. And there is neither claim nor evidence that title to the home was to be taken in her name. I hold that the deceased did not establish an irrevocable trust in her favor during his lifetime.[29] Accordingly, her claim for the full amount of his savings in 1955 through 1959 is rejected. It seems clear, however, and I find that the deceased intended that she would share his savings equally with him. Accordingly, one-half of what he would have saved in 1955 through 1959 should be allocated to her.

I find that in the years 1955 through the end of his work expectancy in 1966 the deceased's average annual net earnings after taxes would probably amount to $6,250. In some of the early years in that period they might indeed exceed that average by reason of increased rates of

29. See Matter of Totten, 179 N.Y. 112, 71 N.E. 748, 70 L.R.A. 711.

wages.[30] However, as time passed, the increased rates would undoubtedly be offset by the deceased's advancing years and corresponding inability to sail as frequently and to do as much overtime work.

I find that from 1955 through 1963, the end of his mother's life expectancy, the deceased would have contributed $550 per year to her; that from 1955 through the end of his own work expectancy in 1966 he would have made gifts to his son of about $50 per year; and that of the remainder of his net earnings, one-half would have been given to his wife and the other half he would have kept for personal expenses and his share of ordinary household expenses. The sums thus allocated to the deceased and his wife include their respective shares of the annual savings in the years 1955 through 1959.

Accordingly, I find the pecuniary losses of the beneficiaries to be as follows:

The widow has already lost $2,825 per year for the five years 1955 through 1959, or a total of $14,125.

The mother has already lost $550 per year for the same period, or a total of $2,750.

The son has already lost $50 per year in the same period, or a total of $250.

These sums which have already been lost are not to be discounted.

The mother, in the period 1960 through 1963, the end of her life expectancy, will lose $550 per year. Discounted at 4%, this amounts to $1,997.

The widow, in the period 1960 through 1963, will lose $2,825 per year, and from 1964 through 1966 she will lose $3,100 per year.[31] These losses, discounted at 4%, amount to $17,602.

The son, in the period 1960 through 1966 will lose $50 per year which, discounted at 4%, amounts to $300.

The foregoing items of loss, recapitulated, are as follows:

| | | |
|---|---|---|
| Deceased's conscious pain and suffering | | 2,850. |
| Widow's lost benefits | (already sustained | 14,125. |
| | (future | 17,602. |
| Mother's lost benefits | (already sustained | 2,750. |
| | (future | 1,997. |
| Son's lost benefits | (already sustained | 250. |
| | (future | 300. |

Total Losses ....$39,874.

From the amount to be paid to the widow, must be deducted the sum of $5,-300, the proceeds of a Second Seaman's War Risk policy which, concededly, were received by Mrs. Braithwaite. All premiums on this policy were paid by the petitioner.[32]

A decree in accordance herewith may be entered on five days' notice with interest from the date of the decree.

## Berk Claim

Lawrence Berk was the vessel's third assistant engineer. He did not survive. He was unmarried and made his home with his parents and his younger brother, Norman. At the time of his death Lawrence was 25 years old; the ages of his mother, father and brother were, respectively, 46, 54 and 14 years. His mother, the administratrix of his estate,

30. In 1957, for example, the base wage was increased from $314.41 to $353.27 per month; and the overtime rate was increased from $1.94 to $2.06 per hour. Judging by the history of recent years, there is no reason to suppose there would be any decrease in these rates.

31. The increase is due to the termination in 1963 of contributions to the mother.

32. See note 16 supra.

makes this claim on behalf of herself, her husband and Norman.

Berk was uninjured when he left the vessel. He was wearing a life jacket over his work clothes. He was last seen alive at 7 P.M. on the day of the sinking. I find he died one hour later, after ten and one-half hours in the water. There is no evidence that, during that period, he was attacked by a shark or otherwise physically injured.

The deceased's life expectancy, according to the United States Life Tables 1949–1951 was about 46 years; that of his mother about 30 years; that of his father about 20 years, and of his brother 55 years.

At the time of the deceased's death and for several years previous both parents were gainfully employed. Their combined annual earnings amounted to $7,500 at his death, and increased substantially in subsequent years. There is no evidence that Norman, then a high school student, was gainfully employed prior to or at the time of his brother's death.

The deceased was graduated from the United States Merchant Marine Academy and commissioned a third assistant engineer in July, 1952. At the end of that month he entered the petitioner's employ as third assistant engineer on the Mormackite, and continued to sail in that capacity until the vessel sank in October, 1954. His net earnings after taxes in 1952 were $2,600; in 1953, $7,000; and approximately $6,000 up to his death in 1954.

Beginning in October, 1952 and continuing until his death, he sent regular allotments from his wages to his mother as follows: $480 in 1952; $2,360 in 1953; and $2,360 in 1954. The mother testified that, in addition to the allotments which she claimed as gifts to her and her husband, when the deceased came home between trips he always gave her "between $100 and $300 for family expenses"; and gave his younger brother Norman "between $15 and $25" to buy records for a record player which the deceased had purchased for him at a cost of $150. She said he had also purchased a bicycle for

Norman for $75. She further said that in the fall of 1952 he gave her $600. She did not fix the number of occasions when she received cash for family expenses, but it seems a reasonable assumption that the deceased got home at least six times a year. Thus, according to her testimony, his cash contributions for family expenses averaged at least $1,200 per year, and his gifts to Norman about $300 per year. On this basis the total of allotments and cash in 1952 amounted to at least $1,080; in 1953, to at least $3,860; and in 1954, to at least $3,260. Furthermore, in 1954 the mother concededly received additional sums totaling $2,200 from funds which I find belonged to the deceased. They were on deposit with the Dime Savings Bank of Brooklyn in a joint account in the names of the deceased and his cousin, Mrs. Thelma Sundick. The latter drew the $2,200 from the account and gave it to Mrs. Berk. The balance on deposit in the account at the deceased's death concededly was paid to Mrs. Berk by Mrs. Sundick. I accept the latter's testimony that all money that was ever in the account belonged to the deceased.

According to the testimony of Mrs. Berk, we have a situation which is, to say the least, unusual; that out of his total net earnings of $15,600 between August, 1952 and October, 1954, the deceased, a young man just starting his professional career, made outright gifts of two-thirds of them, or $10,110, to his parents and one brother who concededly were not dependent on him for support. But that is not all. According to Mrs. Berk, in May, 1952, while he was still in the Academy, he turned over to her the whole of his accumulated savings which amounted to $1,331. Thus, it is contended, the beneficiaries received from the deceased in a period of two and a half years, outright gifts amounting to $11,441. This represents an average of $4,576 per year. And the court is urged to take this as the measure of what the beneficiaries could reasonably expect to receive from the deceased in the future if he had lived.

This claim, unusual enough on its face, was not made more plausible by the

manner in which Mrs. Berk handled the allotment checks. She and her husband had their own joint savings account and she had a personal checking account. However, not one of the allotment checks was ever deposited in either of these accounts. On the contrary, all but two, each for $120, which were received in January, 1953, were regularly deposited in a savings account in the name of "Mae Berk in trust for Larry Berk." This account had been opened in 1947 with money earned by Larry during his summer vacation, and all his savings up to May, 1952 were deposited in it. At the end of April, 1952, the balance on deposit was $1,331. There is no doubt, indeed it is conceded, that this money then belonged to him alone. However, according to Mrs. Berk, in May, 1952, Larry told her "I want you to take over this account for your own use. Do not consider it my account any more"; and she did as he told her. Despite this, she continued it as a trust account for Larry and made no withdrawals from it for her own or her family's use until April, 1953 when she said she withdrew $40. Moreover, in July, 1953, when Mrs. Berk and her husband, as the first step in their plan to build a home, bought a piece of land for $1,900, the money for this was taken from their own joint account, although the balance in the trust account was then $3,721.22. By the end of 1953 this balance had increased to $4,729, and the interest that year amounted to $59.59. Mrs. Berk, who prepared Larry's income tax returns, listed interest of $60 as income taxable to him for that year. Larry owned no securities and the amount reported exceeded the $41 of interest for that year on the Sundick-Berk joint account, with the details of which, in any event, Mrs. Berk disclaimed familiarity. The $60 item, then, can only be accounted for by the interest earned on the deceased's trust account. The return showed a balance of tax due amounting to $375.94. This was paid by Mrs. Berk with funds drawn from Larry's trust account on March 10, 1954. It is hardly likely that Mrs. Berk would have

caused her so generous son to pay tax on income that was really hers. And if her testimony be taken as true, it is incredible that Larry would have permitted her to use so much of her funds to pay his tax.

I cannot and do not accept Mrs. Berk's testimony as to the extent of her late son's contributions and gifts. I find he did not make a gift of the balance in his trust account in 1952. I further find that the allotments were not gifts to Mrs. Berk but, on the contrary, were savings of the deceased which she was required to deposit, as she did, in his trust account.

It is reasonable, however, to assume that the deceased, who made his home with his family between voyages, made some contribution towards household expenses. It is also reasonable to assume that he made gifts to his parents, and to some small extent to his younger brother. The probable amounts of his future gifts will be considered later.

I find from the documentary evidence that $5,000 of the deceased's funds in his trust account and $2,200 of his funds in the Sundick-Berk joint account were withdrawn in March and April, 1954 and used by Mrs. Berk to make payments on the home she and her husband built on the lot purchased with their own funds in 1953. The deceased was ashore for a few days at the end of June, 1954 and visited the new home. It is certainly a fair inference that he learned then, if he had not before, that $7,200 of his funds had gone into the new home; and that he approved this. The petitioner suggests that this may have been a loan. That theory is indeed supported by an answer of Mrs. Berk to a pre-trial interrogatory propounded by the petitioner. She then said that Larry had an "equitable interest in the new home." Although she testified she understood the meaning and implication of this, she said she was in error in saying it. She insisted the $7,200 was a gift. As to this, as the petitioner concedes in its brief, it is surely not unreasonable to suppose that the deceased helped to provide his parents with a home of their own. Accordingly,

I find he made them a gift of the $7,200. It by no means follows, however, that this is a fair measure of what he would contribute to them in the future, and I find it is not. The deceased was an attractive looking, healthy, normal young man. In all probability by the time he reached the age of 30 in 1959 he would have married and established a home of his own. This certainly would preclude the possibility of such continued generosity to his parents and brother.

I find that in each of the five years 1955 through 1959 he would have contributed at most $1,000 to his parents and $50 to his brother. Accordingly, the parents have already lost $5,000 and the brother has lost $250. These amounts are not subject to discount.

It is, as the petitioner concedes, a fair inference that, if the deceased had lived, he would make some cash contributions to his parents from time to time; and that, if, as they grew older they needed pecuniary assistance, he would supply as much of their needs as he was able. I find accordingly. I think it is also a fair inference, and I find that he would have made some small cash gifts to his younger brother from time to time. What such contributions and gifts would amount to cannot be precisely determined. This can only be approximated on the basis of the facts as found. Accordingly, taking into consideration the ages of the deceased and the beneficiaries, their life expectancies, the likelihood that the deceased would marry and have his own home, and applying 4% as the rate of discount, I think an award to the parents of $20,000, and to Norman of $1,000 will fairly compensate them for their future pecuniary losses.

■ The awards are summarized as follows:

Deceased's conscious pain and suffering ......$ 3,100.
Mr. and Mrs. Berk's benefits already lost ..... 5,000.
Norman Berk's benefits already lost ......... 250.
Mr. and Mrs. Berk's future lost benefits ...... 20,000.
Norman Berk's future lost benefits .......... 1,000.

Total Losses .... $29,350.

---

The total award to Mr. and Mrs. Berk must be reduced by $5,500, the amount concededly received by Mrs. Berk as beneficiary of a Second Seaman's War Risk policy, all of the premiums for which were paid by the petitioner.[33]

A decree in accordance herewith may be entered on five days' notice with interest from the date of the decree.

### Cadiz Claim

Carmen Cadiz was third cook on the Mormackite. He did not survive. His widow, the administratrix of his estate, makes this claim on behalf of herself and their two minor children, Richard and Robert.[34]

Cadiz was uninjured when he entered the water. He was then wearing a life jacket over his work clothes. He was last seen alive about 6:30 P.M. on the day of the sinking. I find he died one hour later, after ten hours in the water. There is no evidence that he was attacked by a shark or otherwise physically injured during that time.

At the time of his death the deceased's age was 38 years, and the ages of his

33. See note 16 supra.

34. Initially it was claimed that the deceased's mother, aged 77, was also a beneficiary. However, it developed at the trial that for more than a year before his death his mother lived with and was supported by one of her daughters. In the brief submitted after trial by the claimant's proctors no claim is made for the mother.

widow and their two sons were 33, 10 and 9 years, respectively.

The deceased's life expectancy according to United States Life Tables 1949–1951 was about 33 years. His work expectancy, however, was very much less. He certainly would not be employed at sea until he was almost 72 years old. And, in any event, he was by no means a steady maritime worker. His Coast Guard record shows he took long periods ashore. Thus he was ashore during almost half of 1952 and half of 1953. In 1954 he was ashore for two out of the nine months prior to his death. During these periods ashore he stayed at home most of the time doing the cooking and housekeeping while his wife went out to work as a machine operator. I find the deceased would have ceased work when he became eligible for social security at age 65. Accordingly, I find his work expectancy was 27 years when he died.

His earnings were stipuated as follows: 1951, $2,856.40; 1952, $3,943.22; 1953, $3,872.69; 1954 (up to his death) $3,456.22. It does not appear whether these represent net earnings after taxes. However, since the petitioner in all of these claims has, quite correctly, urged that contributions claimed to have been made to surviving beneficiaries of a deceased should be considered in light of his net earnings after taxes, I assume that the foregoing are net earnings, and I find accordingly.

The widow estimated that annual household expenses, clothing and medicines for herself and her two sons, and the latter's school expenses totaled $3,200 per year. She said she received this amount from the deceased. The latter testimony I do not accept. Her earnings in 1952 were stipulated to be $858.05; in 1953, $2,053.05; and in 1954, $1,349.89. I find that some of the $3,200 of family expenses must have come from her earnings. Moreover, some part of the family household expenses must be attributed to the deceased.[35]

It is true that his work record in 1954 shows improvement over the previous years. However, I find it unlikely, in view of the deceased's past employment record, that in the period 1955 through 1959 his net earnings would have averaged more than $4,200 per year. I find they probably would have averaged that amount. I further find that one-fourth of this, or $1,050, must be allocated to his personal expenses and his share of the usual household expenses.[36] Thus the amount available to his widow and children each year would have been $3,150. Thus they already lost $15,750 for the period 1955 through 1959. This is not subject to discount.

I find, on the basis of the deceased's past work record, that as he neared the end of his work expectancy he would work less. His improved industry just before his death might, it is true, continue for a few years after 1954. Nevertheless his entire work history compels the inference that he would work less as he approached retirement age. I so find.

Accordingly, I find his average annual net earnings from 1960 through 1981, when he would reach age 65, would be, at most, $4,200. The amount available from these earnings for his wife and children would vary during that period, however, because his son Richard would become 21 in 1965 and Robert in 1966.

I find that in each year during the period 1960 through 1965 one-fourth of the annual net earnings would be attributable to the deceased, leaving $3,150 for his wife and two children.

I find that in the year 1966, one-third of the net earnings would be attributable to the deceased, leaving $2,800 for his wife and one child.

I find that in each year during the period 1967 through 1981, one-half of the net earnings would be attributable to the deceased, leaving $2,100 to his widow. The present value of these future losses to the wife and children, discounted at 4%, is $36,000.

35. See O'Connor v. United States, supra, note 9.

36. Ibid.

■ The deceased, while certainly not a good example of industry, was nevertheless kind and devoted to his children. According to his widow, whose testimony on this I accept, he spent considerable time with them; frequently played ball with them; encouraged them to study and took them to the museums. The children have lost this care and nurture which I find to be worth $750 per year to each child. Each of them, therefore, has already lost $3,750 for the period 1955 through 1959. These losses are not subject to discount.

Richard will continue to lose $750 each year during the period 1960 through 1965. The present value of these losses, discounted at 4%, is $3,930.

Robert will continue to lose $750 each year during the period 1960 through 1966. The present value of these losses, discounted at 4%, is $4,500.

■ The foregoing findings as to losses are summarized as follows:

| | | |
|---|---|---:|
| Deceased's conscious pain and suffering | | $ 3,000. |
| Widow's and children's lost | | |
| benefits from earnings (already sustained | | 15,750. |
| (future | | 36,000. |
| Richard's loss of nurture, etc. (already sustained | | 3,750. |
| (future | | 3,930. |
| Robert's " " " " (already sustained | | 3,750. |
| (future | | 4,500. |
| | Total Losses .... | $70,680. |

———◆———

The total award for losses of the widow and children from past and future earnings must be reduced by $5,300. This is the amount received by the widow as beneficiary of a Second Seaman's War Risk policy, the premiums on which were all paid by the petitioner.[37]

A decree in accordance herewith may be entered on five days' notice with interest from the date of the decree.

### Rosario Claim

This claim is made by Remy Rosario, one of the survivors, who was the bo'sun on the Mormackite. He was uninjured when he entered the water. He was then wearing his life jacket over his work clothes. He was taken from the water by one of the rescue vessels 49¼ hours after the sinking, and brought to Norfolk, Virginia where he was placed in the United States Public Health Service Hospital. He was then 43 years of age.

He seeks damages for the following alleged permanent injuries: active rheumatoid arthritis, involving both hands; immersion syndrome affecting right shoulder and spine; and post traumatic neurosis of marked intensity. All of these, he claims, and particularly the latter, render him incapable of ever serving at sea and result in substantially diminishing his earning capacity for the remainder of his life. In his brief after trial, the claimant's proctor asked an award of $110,000.

The petitioner contends that the claimed physical injuries are exaggerated and, in any event, are not disabling; and that Rosario's alleged psychiatric symptoms are a complete fabrication.

The petitioner has paid Rosario maintenance amounting to $2,440.[38] No claim is made for additional maintenance.

The claimant was born in Ponce, Puerto Rico. He has had little, if any, for-

37. See note 16 supra.

38. This was paid as follows: $472 in 1954 and $1,968 in 1956.

mal education. At the age of 13 he started going to sea with an uncle who was a commercial fisherman. His merchant marine service began in 1940. He was obviously a proficient seaman for, within four years, he became a bo'sun and for the ten years before the sinking served in that capacity whenever he sailed.

During the five years immediately prior to the sinking his average sea service was six months and his average earnings were $3,860, per year.

During the five years immediately following the sinking he served at sea a total of only 6½ months, as follows: 1 month in 1955, 3½ months in 1956 and 2 months in 1957. Between the end of 1956 and May, 1957 he worked for about 20 weeks delivering groceries at $30 per week. In August of 1957 he went to work as a porter in Bellevue Hospital in New York City. Since then he has been steadily so employed at a salary of $2,500 per year. His earnings for each of the years 1955 through 1959 were as follows: 1955, $700; 1956, $2,900; 1957, $2,300; 1958, $2,500; 1959, $2,500. Thus his average annual earnings for the five years following the sinking amount to $2,180 per year, or $1,680 less than his annual average for the comparable period before the sinking. His present earnings of $2,500 are $1,360 per year less than his annual average for five years before the sinking.

On the evening of the day of the sinking Rosario was close by one of the crew, Frost, when the latter's leg was severed by a shark which brushed Rosario's leg just before the attack on Frost. Rosario helped to get Frost up onto a pallet; he then saw the man bleed to death and helped push his body into the sea. The following morning Rosario heard an unidentified seaman scream and then saw him disappear in blood-stained water; later Rosario fought off large fish which he believed to be sharks. Each time Rosario went to sea after the sinking he suffered headaches and other bodily pains and became very nervous and tense; and fearful of the sea. The foregoing findings as to Rosario's experiences prior to and after his rescue are, it is true, based largely on his own testimony at the trial. I observed him closely while he testified. He was nervous. He constantly wiped the palms of his hands which were perspiring. At the conclusion of his testimony he had tears in his eyes. These reactions were not simulated. I accept his testimony.

At the hospital in Norfolk after his rescue he was found to have superficial abrasions of the skin and an abscess on the left leg. He was treated there from October 10 to October 29, 1954 when, at his own request, he was discharged with directions to rest for 30 days and to report for out-patient treatment at New York.

He returned to his home here and, between November 2 and December 20, 1954, was examined and treated on seven occasions as an out-patient at the United States Public Health Service Clinic, Hudson and Jay Streets, New York. There it was found that the wound in his left leg was healing but that he was suffering from "post-traumatic neurosis." On December 20, however, he was declared fit for duty as of January 1, 1955. At the request of his proctor, who urged that the claimant was not fit for sea duty, he was given a "thorough work up" by a group of doctors at the clinic on December 27 and 29. This, too, resulted in a diagnosis that he was suffering from "post-traumatic neurosis." Nevertheless, he was again declared fit for duty; this time as of December 27, 1954. He did not then return to sea.

On April 27, 1955 he again came to the clinic and was declared fit for immediate duty. There was no new diagnosis.

He first returned to sea on June 10, 1955, when he signed on a vessel of the petitioner as a deck maintenance man. On July 12 he complained of pain in his left leg and left the vessel at Norfolk, Virginia. At the Public Health Service out-patient clinic there, the doctor who examined him recorded his "impression" that the claimant had "adhesion plus anxiety neurosis plus mild hyperten-

sion." He did not declare him fit for duty but referred him to the Marine Hospital in New York for treatment. Rosario returned to New York and on July 15 became an out-patient at the United States Marine Hospital, Staten Island, where from time to time during the next nine months he was examined and treated for various complaints of nervousness and of pains in his arms, hands, back and legs. On April 27, 1956, he was again declared fit for duty although the diagnosis was "post-traumatic syndrome, dream state."

On May 14, 1956 he signed on as bo'sun on a vessel not operated by the petitioner and continued in this employment until September 4, 1956. During that period he worked regularly and made no medical complaints.

However, on September 6 he returned to the Marine Hospital on Staten Island where he complained of bodily pain and nervousness. He received out-patient care until October 3 and was then hospitalized until October 12, 1956, when he was again declared fit for duty. This time the diagnosis was "pyscho-psyciological reaction—dream state."

On June 4, 1957, while serving as bo'sun on a vessel of the petitioner, he complained of head pains. A doctor to whom he was sent in Montevideo, diagnosed his condition as "anxiety neurosis."

Only two doctors testified at the trial. Both were called by the claimant. They were Dr. Bick, an orthopedist, and Dr. Merino, a psychiatrist. Dr. Bick examined the claimant on five occasions between December, 1954 and December, 1958. Dr. Merino examined the claimant in January, 1957 and September, 1958. The parties stipulated what five other doctors would testify to if called. These were Dr. Klingdon, a neurologist who examined the claimant for the latter's account in February, 1955, and the following who examined him for the petitioner's account on the dates appearing after their names: Drs. Irvin and Howard Balensweig, orthopedists, January and July, 1955, respectively; Dr. Wright,

cardiovascular specialist, March, 1955; Dr. de Gutierrez-Mahoney, neuropsychiatrist, August, 1955.

On all the evidence as to orthopedic injuries I find as follows. The claimant while in the water after the sinking sustained a wound in his left leg which became abscessed. This was completely healed by the end of January, 1955, about four months after the sinking, and has not resulted in any permanent disability. As a result of long immersion before his rescue, the claimant developed rheumatoid arthritis of the right hand. This is permanent but, though painful, is not disabling. It does not prevent him from working as a seaman. He has some arthritic changes in his lower back and legs. These are not causally related to the sinking but his long immersion has aggravated them. They are not disabling and do not interfere with his present work. They would not prevent him from working as a seaman.

Dr. Merino was of the opinion that Rosario was suffering from a severe post-traumatic neurosis which is permanent although it may be relieved to some extent by long and extensive psychiatric treatment. All the medical evidence on the point, including the Public Health Service records and the opinions of the petitioner's experts, Doctors Wright and Gutierrez-Mahoney, supports or is at least consistent with Dr. Merino's opinion. I accept his opinion as to Rosario's condition and I find accordingly. I further find that the condition was caused by the sinking and Rosario's experiences in the water until he was rescued. I find further that Rosario's condition prevents and will continue to prevent him from working as a seaman.

It was stipulated that out-patient psychiatric care is not available at any Public Health Service facility within a reasonable distance of Rosario's home in New York; and that such free psychiatric care as may be available at other public facilities in New York is not available to a seaman such as Rosario. I find on Dr. Merino's testimony that Rosario requires a long period of psychiatric

treatment; that this would necessarily extend over a period of more than a year; and would be expensive.

At the time of the sinking, Rosario's life expectancy was 25 years. His work expectancy, however, was only 22 years. That period will expire in 1976. He will then be 65 years old and eligible for social security benefits.

■ He has already lost earnings of $1,680 per year for the years 1955 through 1959, a total of $8,400. This is not subject to discount.

■ I find, after allowing for possible wage increases and the likelihood that he will work less as he gets older, that, for the period 1960 through the end of his work expectancy in 1976, Rosario will sustain wage losses averaging $1,700 per year. These losses, discounted at 4%, amount to $20,690.

Rosario is entitled to an award of $29,090 for past and future lost wages. He is also entitled to an additional award of $45,000 for pain and suffering from the sinking to the present and in the future, and for future psychiatric care.

A decree in accordance herewith, with interest from the date of the decree, may be submitted on five days' notice.

### De Jesus Claim

This claim is made by Pedro De Jesus, a wiper on the Mormackite. He survived the sinking. He was uninjured and wearing his life jacket over his work clothes when he entered the water. He was picked up 49¾ hours later by one of the rescue vessels and brought to Norfolk, Virginia where he was placed in the United States Public Health Service Hospital. He was then 52½ years of age. He seeks damages for alleged permanent orthopedic and psychiatric injuries.[39]

The petitioner contends that the alleged orthopedic injuries are exaggerated and, in any event, not disabling; and that the claimant was neurotic before the sinking and is no more so now.

The petitioner has paid the claimant maintenance amounting to $4,644 for various periods between October 25, 1954 and January 4, 1957. No claim is made for additional maintenance.

The claimant was born in Urrocenes, Puerto Rico. His formal education was limited to the first two grades of elementary school. He worked as a laborer and longshoreman in Puerto Rico before coming to the United States in 1935. Thereafter until 1949 he worked in restaurants and hotels as a kitchen helper and dishwasher. He did no work and had no earnings in 1950. He began going to sea as a merchant seaman in 1951. He holds a Coast Guard certificate as ordinary seaman, wiper and messman.

During the four years immediately prior to the sinking his average sea service was six months and his average earnings were $2,550, per year.

During the four years immediately following the sinking his average sea service was about three months and his average earnings at sea and ashore were $1,300 per year.

His average annual earnings during the four years immediately after the sinking were $1,250 less than his annual average during the comparable prior period.

Shortly after he entered the water, De Jesus and a fellow seaman, Roman, got hold of a wooden ladder. At times De Jesus lost his hold, but each time regained it. He and Roman stayed together and were using the ladder to keep themselves afloat when they were rescued. It was stipulated that De Jesus did not see anyone attacked by sharks and did not see anyone drown.

At the hospital in Norfolk, he was found to have multiple abrasions and "brush burns" on various parts of his body. He was discharged after two weeks but marked "unfit for duty" and directed to report to the Public Health Service at New York for evaluation and determination of his duty status. He was examined and treated as an out-pa-

---

39. In his brief after trial, the claimant's proctor urges an award of $75,000.

tient at the Hudson Street clinic of the Public Health Service in New York on nine occasions between October 25, 1954 and February 28, 1955. At the end of November he was found to be suffering from "anxiety state"; and at the end of December from "post-traumatic neurosis." Nevertheless on February 28, 1955, he was declared fit for immediate duty. Thereafter from March 3, 1955 up to the end of 1958, he made more than forty visits as an out-patient to Public Health Service clinics in New York, and was hospitalized at Staten Island during two periods of three weeks each. The first of these was in January, 1956, the second in July, 1958. Throughout his long history of in-patient and out-patient care from his rescue until the end of 1956, he was, on many occasions, declared fit for duty although found to be either in a state of anxiety; or neurotic; or suffering from post-traumatic reaction. However, in January, 1957 his condition was diagnosed as chronic post-traumatic disturbance and he was declared unfit for duty for at least six months. Again, in August, 1957, he was found unfit because of severe anxiety reaction. Finally, in July, 1958, he was found unfit for sea duty, without time limit, because of post-traumatic phobic psychoneurotic reaction. He was then advised to seek employment ashore.

He has not heeded that advice. At the trial he testified that when he is at sea he becomes nervous and fearful; and has trouble with his stomach. I accept that testimony and find accordingly. He was very nervous and restless while testifying. At one point, when asked to identify a photograph of one of the deceased crew members, he screamed and sobbed "I don't want to see no pictures. Oh, my God save me. I don't want to remember this at all." I do not believe he is capable of making a simulated reaction appear so real. I find his reaction was genuine.

Only two doctors testified at the trial. They were Dr. Bick, an orthopedist, and Dr. Merino, a psychiatrist. Both were called by the claimant. Dr. Bick examined the claimant on three occasions between November, 1954 and August, 1955. Dr. Merino examined the claimant in December, 1956 and September, 1958. The parties stipulated what two other doctors would testify to if called. These were Dr. Gutierrez-Mahoney, a neuropsychiatrist, who examined the claimant for the petitioner's account on one occasion in August, 1955; and Dr. Negrin, a neurologist who examined the claimant for the latter's account on five occasions during the fall of 1956.

I find that the claimant while in the water sustained orthopedic injuries consisting of multiple abrasions and brush burns; and that these were entirely healed, at the very latest, by the end of February, 1955. There are presently arthritic changes in his back, left hand and his ankles. These are not causally related to the sinking but result from degenerative processes which antedate the sinking. They are not disabling.

Dr. Merino was of the opinion that the claimant is suffering from severe post-traumatic neurosis; that his condition in September, 1958 was considerably worse than when the doctor first examined him in December, 1956; that the condition might be relieved but only by intensive psychiatric treatment over a period of at least a year. These opinions were not contradicted nor disputed by any competent medical evidence.

Dr. Gutierrez-Mahoney found essentially negative neurological signs. Nevertheless he too was of the opinion that the claimant was suffering from a psychoneurosis which was causally related to the sinking.

Dr. Negrin found no objective neurological signs but referred the claimant to Dr. Merino for psychiatric examination.

Prior to the sinking De Jesus had an extensive medical history of complaints and treatments for a wide variety of medical conditions. These included injuries to his left hand and back; hernia, stomach disorders; and assorted illnesses of the eyes, chest and mouth. This

history does indeed suggest to a layman that even before the sinking the claimant may have suffered from hypochondria or some other form of neurosis. However, there is no evidence that his condition was ever so diagnosed by anyone professionally qualified to do so, during his extensive treatments prior to the sinking. The diagnoses of neurosis appear only after that event. And no doctor who has examined or treated him since then has expressed the opinion that the claimant's present neurosis existed before the sinking.

I find the claimant is suffering from a severe post-traumatic neurosis; that this condition was caused by the sinking and his subsequent experiences in the water; and that, although it possibly can be relieved to some extent by adequate competent psychiatric care, it is permanent. The prescribed care is not presently available to De Jesus at any local public institutions.[40] The required treatment will be expensive.

At the time of the sinking De Jesus' life expectancy was 21 years, according to the United States Life Tables 1949–1951. I find accordingly. I further find his work expectancy was $12\frac{1}{2}$ years. That period will terminate at the end of 1966. He will then be 65 years old and eligible for social security benefits.

As already found, he has already lost $1,250 per year for the five years 1955 through 1959, a total of $6,250, which is not subject to discount.

I find after taking into consideration possible wage increases and the likelihood that as he gets older he will work less, that his average loss in wages for the remainder of his work expectancy will be $1,450 per year. These future losses, discounted at 4%, are presently worth approximately $9,100.

De Jesus is entitled to an award of $15,350 for past and future lost wages. He is also entitled to an additional award of $35,000 for past and prospective pain and suffering and for future psychiatric care.

A decree in accordance herewith with interest from the date of the decree may be submitted on five days' notice.

### Del Valle Claim

This claim is made by Tadeo Del Valle, one of the survivors, who was an ablebodied seaman on the Mormackite. He was uninjured when he left the vessel. He was then wearing his life jacket over his work clothes. After a few hours he and another survivor, Williams, lashed some boards together and made a raft. The following day they were joined by a third survivor. Forty-nine hours after he left the vessel he and the other two men were taken from the water by one of the rescue vessels and brought to Norfolk, Virginia where he was placed in the United States Public Health Service Hospital. His age, as stipulated, was then 55 years years and 9 months.

He had multiple abrasions which, however, were not serious. They were fully healed by November 10, 1954. They have not resulted in any permanent disability. The claim is based chiefly on the claimant's alleged pain and suffering in the water and also his alleged serious permanent mental illness.[41] The existence and severity of this illness are not disputed. Neither, however, is it disputed that the claimant had a history of clinical treatments and hospitalizations for mental illness long antedating the sinking. This history dates from September, 1921 while he was in the United States Marine Corps from which, in April, 1922, he received a medical discharge because he was suffering from dementia praecox. Accordingly, the petitioner contends, "the Mormackite episode did not cause or create the [mental] condition from which Del Valle suffers. At most, it merely precipitated another one of these overt episodes at a time when on the basis of past history Del Valle was perhaps about due for another one, in any event."

---

40. See page 57 supra.

41. In his brief after trial, the claimant's proctor urges an award of $75,000.

The petitioner paid Del Valle maintenance up to November 30, 1954, amounting to $376. No claim is made for further maintenance.

Del Valle was born in Ponce, Puerto Rico. He had reached the 8th grade in school when his father put him· to work on a farm. He was then 14 years old. In 1916, when he was 17 years old, he enlisted in the United States Army and served as private in an infantry regiment until April, 1920 when he was honorably discharged. He joined the Marines in April, 1921. In September of that year, after some bizarre conduct while serving in Haiti, he was hospitalized for eight months and given the medical discharge mentioned above.

He first went to sea as a merchant seaman in 1923 and sailed from time to time during the next three years. In 1926 he stopped going to sea and, until 1939, worked ashore at various laboring jobs, including house wrecking. In 1938 he was found by the Veterans Administration to have a 10% service-connected disability described as "nervousness." In 1939 he returned to sea. In 1950 he went to Puerto Rico where he rested for several months because he was "tense and nervous."

During the period from 1942 until the sinking in 1954, his average sea service was 5½ months per year.

During the five years immediately prior to the sinking, his average sea service was 4 months and his average earnings were $2,300, per year.

During the five years immediately following the accident, his average sea service was 2 months and his average earnings were $900, per year.

His first sea service following the sinking was from July 14 to August 4, 1955. Then, after three months ashore he was at sea for 5 days ending October 28, 1955. During these two periods at sea he had no reported injury or illness. His next service at sea was from November 1, 1955 to January 3, 1956, when he signed off his ship at Recife, Brazil. He was there examined by doctors to whom his complaints suggested "possible persecution mania." He returned to New York and on January 13 was admitted to a Veterans Administration Hospital where his condition was diagnosed as "schizophrenic reaction, paranoid type, moderately severe." He left the hospital with permission on April 27 in order to seek a berth at sea. He was unsuccessful. He returned to the hospital on May 18 and stayed there until September 5, 1956. His mental condition remained unchanged. The hospital doctors were of the opinion that the sinking was "the precipitating stress" of his breakdown. The Veterans Administration has declared his disability to be complete and service-connected. This entitles him to a full disability pension which he is receiving. In June, 1957 he was able to get a berth and served at sea for two periods of 1 month and 2½ months, respectively. He has not been to sea since January 6, 1958.

Only one doctor testified. He was Dr. Merino and was called by the claimant. The doctor examined the claimant in January, 1957 and April, 1959. He confirmed the diagnosis of the doctors at the Veterans Hospital and their conclusion as to the relation of the claimant's present condition to the sinking. There was no medical testimony to the contrary. The petitioner, indeed, concedes that "the Mormackite experience caused or materially contributed to the breakdown [Del Valle] finally had in 1956."

I find that before the sinking, Del Valle, despite mental illness of comparatively mild degree, was sufficiently adjusted to work as a seaman with fair regularity. I find he is now unable to do so because of his present mental illness. I find his illness is as diagnosed by the doctors at the Veterans Hospital and Dr. Merino; and that the sinking and his subsequent experiences in the water were the proximate precipitating cause of his present condition.

At the time of the sinking his life expectancy, according to the United States Life Tables 1949–1951, was 19

years and I find accordingly. His work expectancy, I find, was then only 10 years. When that period expires he will be 65 years old and eligible for social security benefits.

Del Valle has already sustained a total wage loss of $7,000 for the period 1955 through 1959. This loss is not subject to discount.

Even before the sinking, Del Valle, from time to time, returned to Puerto Rico to rest. He now makes his home there on a small farm which he owns and works. I find that even if his mental health had not so seriously deteriorated since the accident, he would, by reason of his condition prior to the sinking and his advancing age, work less than his pre-accident average during the five-year period 1960 through 1964. Accordingly, I find that even allowing for possible increases in wage rates, his average annual loss of earnings during those years will be, at most, about $1,250. The present value of these future losses, discounted at 4%, is $5,565.

 Del Valle is entitled to an award of $12,565 for past and future lost earnings. He is also entitled to a further award of $35,000 for past and future pain and suffering, and permanent mental illness.

 The damages covered by the foregoing awards were computed without regard to Del Valle's government pension.

A decree in accordance herewith, with interest from the date of the decree, may be entered on five days' notice.

### Sullivan Claim

This claim is made by Shed Sullivan, an oiler on the Mormackite, who survived. He left the vessel, uninjured and wearing his life jacket over his work clothes. Soon after entering the water he got hold of a board, 10 feet long, 1½ feet wide and 2½ inches thick, which he used for support until he was rescued 46 hours after entering the water. During the first hour or so he was in a group, but then drifted off and was alone until rescued. He saw no sharks and saw no one drown. At the time of the sinking he was 28 years old.

He claims damages for orthopedic injuries alleged to be 25% disabling, and severe psychoneurosis which is permanent and not likely to be cured by psychiatric treatment.[42]

The petitioner contends that whatever orthopedic injuries the claimant sustained as a result of the sinking were entirely cured by mid-December following the sinking; and that such "neurosis" as in fact exists, is not disabling and was neither caused nor aggravated by the sinking.

The petitioner has paid the claimant $488 for maintenance up to December 14, 1954, the date when he was first declared fit for duty following the accident. No claim is made for additional maintenance.

The claimant was born and raised in Darien, a small town in Georgia. He completed the 10th grade in school there in 1943 when he was 17 years old. He then joined the United States Marine Corps from which, fifteen months later, he was honorably discharged. He began going to sea on merchant vessels, at the age of 20, in September, 1946. He holds a Coast Guard certificate as wiper, messman and ordinary seaman.

At the hospital in Norfolk after his rescue, he was found to have multiple superficial abrasions, very mild conjunctivitis and gastritis. He was discharged after four days, and advised to rest at home for two weeks. He was then living in Townsend, Georgia, a small hamlet 47 miles southwest of Savannah. After ten days at home he went to Savannah and reported at the Public Health Service clinic there. He was found to have skin lesions and an ulcer on his right arm. After nine visits between October 25 and December 14, 1954, he was found and declared fit for immediate duty. Shortly thereafter he came to New York and, on January 6, 1955, went to the Hudson Street clinic of the Public Health

---

42. In a brief after trial, the claimant's proctor urges an award of $40,000.

Service. He there said he was "anxious to return to work if there was no organic cause for his complaints," which he felt "were purely functional." He was examined and declared fit for immediate duty although his condition was diagnosed as "mild post-traumatic neurosis." This was his last treatment for any medical condition attributable to the sinking. He received subsequent treatments both as an out-patient and in-patient at Public Health Service facilities, but these were for conditions of his scalp and of his eyes, none of which, it was stipulated, was caused by the sinking.

During the four years immediately prior to the sinking, his average sea service was about 10 months and his average earnings were $4,800, per year.

During the four years immediately after the sinking, his average sea service was about 7 months and his average earnings were $4,200, per year.

In 1957 he was ashore for a total of 3 months taking treatments for the medical conditions concededly not related to the accident. In 1958 he was again ashore for two weeks taking treatments for such conditions.

I find that the reduction in his average sea service and earnings since the sinking has not resulted from any injury caused by the sinking.

Only two medical experts testified. Both were called by the claimant. They were Dr. Bick, the orthopedist, who examined Sullivan in November, 1954 and September, 1958; and Dr. Reback, a neuro-psychiatrist, who examined him on October 8, 1958. The claimant also called a clinical psychologist, Dr. Brown,[43] to whom he had been referred by Dr. Reback. Sullivan was given a series of psychological tests on October 15, 1958. These, though administered by an associate, were interpreted and rated by Dr. Brown.

Dr. Bick's first examination revealed abrasions, some scars and some general limitation of motion which undoubtedly resulted from Sullivan's efforts to remain afloat for 46 hours. When the doctor again examined him four years later there was still a scar on Sullivan's right elbow. This was still visible at the trial. It was then about the size of a twenty-five cent piece. There is presently no limitation of motion. Dr. Bick was of the opinion that Sullivan is orthopedically disabled to the extent of 25%. By this, he said he meant that, Sullivan, in order to do his regular work as well now as before the sinking, has to exert 25% more energy than previously. This conclusion was concededly based on Sullivan's account of how he felt while working. That account was repeated by Sullivan at the trial. I do not accept it. It is altogether inconsistent with his work record and, more importantly, with the testimony of two disinterested witnesses who observed him while serving in the same watch with him on the tanker Clarke's Wharf from December, 1957 to mid-September, 1958. These men are not employed by the petitioner. They have no interest in this litigation and were friendly towards Sullivan. They impressed me favorably. I accept their testimony. They were one Zavadill, an oiler, and one Edwards, the first assistant engineer who was in charge of Sullivan's 4 to 8 watch. I find from their testimony that Sullivan was a good worker, agreeable and happy. He and Zavadill shared quarters. Sullivan slept well and had no nightmares, as he claimed. He ate well and gained weight. He manifested no dizziness and showed no nervousness or reluctance to work in rough seas off Hatteras or elsewhere. While serving on the Clarke's Wharf, Sullivan was promoted from wiper to fireman-water tender at higher wages. Accordingly, I reject Dr. Bick's estimate of orthopedic disability which was based on Sullivan's statements as to his feelings and condition at sea.

There is no doubt that Sullivan is presently neurotic to some extent. Indeed

---

43. He was awarded the degree of Ph.D. in psychology by Ohio State University in 1933.

this is not seriously disputed. The problem is to determine how much, if any, of his present condition is due to his experiences on the Mormackite. Both Doctors Reback and Brown, in their direct testimony, expressed the opinion that the present condition is severe; and entirely the result of the sinking. On cross-examination, however, it developed that they too accepted at face value everything Sullivan related to them, and that they were either uninformed about or failed to consider the recorded medical history of the claimant prior to the accident. Although Dr. Reback said he felt competent to judge Sullivan's credibility, apparently he was not willing to rely on his own judgment. He sent Sullivan to Dr. Brown at least partly because he thought the latter's testing would discover whether Sullivan was truthful and accurate. Dr. Brown's tests, however, concededly were not designed to determine credibility. Moreover, he expressed no opinion as to this to Dr. Reback. Dr. Reback finally conceded, on the basis of the Public Health Service records, that Sullivan unquestionably had neurotic trends at least two years prior to the sinking. Dr. Brown finally conceded that Sullivan, who is a Negro with a border-line I. Q., is suffering from what the doctor called "cultural neurosis."

I find Sullivan was neurotic for at least two years prior to the sinking. It seems altogether probable that the sinking aggravated this condition, and I so find. His work record since January 5, 1955, however, leads me to believe, and I therefore find, that the aggravation was slight in degree and of short duration; not longer, at most, that six months after the sinking; that whatever degree of neurosis he now suffers from is no greater than it was before the sinking; and it does not interfere with his ability to work as a seaman or require him to exert any more effort to carry on his work than before the sinking.

I find that $17,500 is a fair award for his orthopedic and psychiatric injuries and his pain and suffering.

A decree in accordance herewith, with interest from the date of the decree, may be submitted on five days' notice.

### Henry Claim

This claim is made by Charles Henry, a messman on the Mormackite, who survived. He was uninjured and had his life jacket over his work clothes when he entered the water. Shortly thereafter he got hold of a wooden door which he "rode like a horse." He was in a group with others for about an hour and then drifted off. He was alone and still "riding" the door when he was picked up 50 hours after the sinking. He was brought to Norfolk, Virginia and placed in the United States Public Health Service Hospital there. He saw no sharks, was not attacked, saw no one else attacked and saw no one drown. He was then $54\frac{1}{2}$ years of age.

He claims damages for "a permanent, partially disabling orthopedic condition" and also for "a mental condition which has made working and living more difficult and lessened his ability to cope with the stresses and strains of living." [44]

The petitioner contends that the orthopedic injuries are healed and not disabling; and that if there is, in fact, any present neurosis, this condition existed long prior to the sinking which neither caused nor aggravated it.

The petitioner has paid the claimant maintenance amounting to $392 up to December 20, 1954, the date when he was first declared fit for duty after the sinking. He makes no claim for additional maintenance.

Henry was born in Port of Spain, Trinidad, British West Indies. He was married in 1929 and has six children. His home is presently in New York. He first sailed as a merchant seaman in 1930 and holds a Coast Guard certificate as chief cook, baker and messman. Since 1930, except for a very few short periods,

---

44. In a brief after trial, his proctor urges an award of $40,000.

his work has always been at sea and in the stewards department.

During the four years immediately prior to the sinking his average sea service was 9 months and his average earnings about $3,700, per year.

During the four years immediately following the sinking, his average sea service has been 8½ months and his average earnings have been about $3,700, per year.

At the hospital in Norfolk he was found to have sustained multiple superficial abrasions, and ulcers resulting from trauma, on the hollows posterior to both knees. It was also suspected that he had broncho-pneumonia. He was discharged after three weeks, for a month of convalescence at home and out-patient treatment at the New York Public Health Service clinic. He went to the clinic on November 3, 1954. The diagnosis was post-traumatic induration and superficial abrasions. After six treatments he was found and declared fit for immediate duty on December 20, 1954. He did not return to sea, however. On March 3, 1955, he visited the clinic complaining about his right knee. He was found to have limited extension, due to a 3-inch keloidal scar at the back of that knee. He was declared unfit for duty until March 16, and on that day was found and declared fit for duty immediately. He made a similar complaint on March 29 but was again found and declared fit for immediate duty. He shipped out the following day and sailed regularly until August 14, 1955 when he signed off to give a deposition in this proceeding. During the period March 30 through August 14, 1955, he did not report, nor was he treated for, any illness or injury in any way related to the sinking. Indeed his only medical treatment during that period was for some minor facial injury received in San Juan, Puerto Rico during a fight ashore in which he intervened, between two other members of his vessel's crew. In November, 1955, he complained of poor vision which new glasses corrected. It is not claimed that the poor vision

was caused or aggravated by the sinking. From January, 1956 through early December, 1957, he sailed regularly on the S.S. Brazil. During that period he was treated as an out-patient on five occasions over a period of 10 days in September, 1956 for shortness of breath when climbing stairs and for hypertension. He then shipped out after having been found fit for duty. He made similar complaints once in November, 1956 but was found and declared fit for immediate duty. His next recorded complaint was the following year, on December 18, 1957. He was then found to have a sprained left knee and declared unfit for duty until January 15, 1958, when he was found and declared fit for duty. This sprain was not caused by the sinking. His next reported treatment was for mild conjunctivitis on January 29, 1958. He was declared unfit for duty and, although ordered to return for further treatment, he failed to do so. He shipped out in April, 1958. There is no evidence that the conjunctivitis resulted from the sinking. I find it did not.

The claimant made a total of 21 voyages between the sinking and February, 1959. Prior to each voyage he was given a physical examination by doctors retained by his prospective employer. In every instance but one he was found and declared fit for duty. The exception occurred on January 30, 1956 when he was rejected by the examining doctor because of high blood pressure. Later the same day, however, after a second examination, by a Public Health Service doctor, he was found and declared fit for duty and shipped out the following day. Since January, 1956, his overtime at sea has averaged about 4 hours per day. As a messman during that period he was required to work 7 days a week and his duties included washing dishes, dumping garbage, cleaning stoves and scrubbing floors.

Only two medical experts testified. These, both called by the claimant, were Dr. Bick, the orthopedist, and **Dr. Reback**, a neuro-psychiatrist. The claimant

also called Dr. Brown, a psychologist.[45] Dr. Bick examined the claimant on three occasions: November 11, 1954, November 14, 1955 and October 10, 1958. Dr. Reback and Dr. Brown separately examined the claimant in October, 1958. The parties stipulated what the testimony of four other doctors would be if called. These were Doctors Clark and Connor, cardiovascular experts who examined the claimant for petitioner's and claimant's accounts, respectively; Dr. Jaspin, a roentgenologist, and Dr. Erdman, an orthopedist, both of whom examined the claimant for the petitioner's account. From all of the orthopedist's testimony, I find the claimant is not suffering from any permanently disabling orthopedic condition caused by the sinking. In February and March, 1951, more than 3½ years before the sinking, he was treated as an out-patient at a Public Health Service clinic for a condition diagnosed as arthritis of the cervical spine and left shoulder. Following the sinking he complained of pains in these areas. His immersion and exposure for 50 hours undoubtedly aggravated this condition to some extent. However, as his work and hospital records since early 1955 show, the arthritic condition is not very painful and certainly has not interfered with his ability to work. Neither has the scar on the back of the right leg.

Henry testified in support of his claim for damages. He had previously testified at the trial of the issue of liability. On both occasions his appearance was that of a physically healthy man. And he certainly showed no signs of nervousness or anxiety. Indeed he was more composed than many witnesses the court has observed, including those who like Henry were interested witnesses. He testified that he is still nervous and fearful of the sea; that these conditions make him ill and cause him to have violent nightmares during which his shipmates say he shouts aloud. This testimony is rejected. It was contradicted in detail by three disinterested witnesses who served with him on the S.S. Brazil for about 3½ months before this trial. I accept their testimony.

The rejection of Henry's testimony as to his nervous reactions since the sinking, of itself would be sufficient to require rejection of the conclusion of Dr. Reback. He received from Henry the same history the latter gave at the trial about his post-sinking nervousness at sea. But further, Dr. Reback was not informed as to Henry's prior medical history. This included treatments on three occasions in September, 1949, and fourteen treatments during January, April and May, 1950 for prostatitis; and a diagnosis in July, 1954, just before the Mormackite started on her final voyage, of psychic impotency. These conditions, Dr. Reback conceded, would account for Henry's complaints of fatigue, shortness of breath, anxiety, tension and irritability. Despite this, Dr. Reback, on the basis of what Henry told him about his reactions since the sinking, concluded that Henry is suffering from a severe anxiety state and a personality disturbance; that this condition is permanent and that he would break down if any stress situation arose. The doctor's conclusion is rejected as to the severity and permanency of Henry's nervous and psychiatric condition. It was, as already noted, based on an incomplete history and on Henry's rejected testimony. Furthermore, it is contradicted by Henry's work record since the sinking and his demeanor on the witness stand.

Dr. Brown's conclusion was substantially the same as Dr. Reback's. It too is rejected and for the same reasons.

It is altogether likely, and I find, that Henry suffered abrasions, muscle strain and a considerable degree of fright during his experiences in the water. It is probable too, that he was nervous for some months thereafter and suffered some physical discomfort from his orthopedic injuries. However, his record of medical complaints to, and treatments by, the Public Health Service

45. See note 43, supra.

doctors shows, and I find, that any nervousness and physical discomfort fairly attributable to the sinking did not last for more than six months after his rescue, that is, the end of March, 1955.

I find that the sum of $18,500 is fair compensation for his injuries and all pain and suffering past and future.

A decree in accordance herewith, with interest from the date of the decree, may be entered on five days' notice.

### Hernandez Claim

This claim is made by Miguel A. Hernandez, the chief steward on the Mormackite. He was uninjured when he entered the water wearing his life jacket over his work clothes. He got hold of a large board on which he lay prone until rescued. He was taken from the water 46 hours later by one of the rescue vessels and brought to Norfolk, Virginia where he was placed in the United States Public Health Service Hospital. He was then 41 years of age.

He claims damages for alleged physical and psychiatric injuries, permanent in character.[46] The petitioner contends that the claimed physical injuries are exaggerated and, in any event, not disabling; and that the alleged psychiatric injuries are a complete fabrication.

The petitioner paid Hernandez $1,032 for maintenance up to February 14, 1955. No claim is made for additional maintenance.

The claimant was born in Guajaha, Puerto Rico. His formal schooling was had in Cuba and terminated after the 7th grade. He was married in 1945. No children have been born of that union. He first went to sea aboard merchant vessels in 1934, as a messman. All of his subsequent sea service has been in the stewards department. He holds a Coast Guard certificate as baker, cook and chief steward. He has been employed by the petitioner for many years as a chief steward. He was so employed at the time of the trial and was scheduled to

sail shortly after he completed his testimony. He speaks, reads and writes English, Spanish and Portuguese. His wife is a native of Brazil. He makes his home in Baltimore, Maryland.

He was hospitalized at Norfolk from October 10 to October 18, 1954 and thereafter received out-patient treatment at the Baltimore Public Health Service clinic until October 28, when he was found fit for immediate duty. At both institutions his diagnosis was "multiple abrasions." He returned to the clinic on November 17, and was examined and treated there from time to time until December 22. He was then declared fit for duty although found to have mild strain of the lower back and strain of the right shoulder muscles. He again reported at the clinic on January 6, 1955, complaining of low back pain, and was declared unfit for duty. On January 26, although he concededly felt better, he was, at his request, continued on out-patient status until February 14, 1955, when he was declared fit for duty. He shipped out three days later on his first voyage after the sinking. On May 16, 1955, he again went to the Baltimore clinic. This time he made no complaints about his back or shoulder but said that while at sea he had felt nervous and nauseous when the ship rolled. He was declared fit for duty at once as far as his orthopedic condition was concerned, but a psychiatric examination was arranged for. This was never conducted, because Hernandez shipped out three days later and never returned to the Baltimore clinic. There is no evidence that since May 16, 1955 he has been treated for complaints of any kind, and it is inconceivable that, if any such evidence existed, it would not have been produced. I find Hernandez has not been treated since May 16, 1955. He has undergone 16 pre-sign-on medical examinations since the sinking. On each occasion he was found and declared fit for duty. At the time of the trial he had completed twenty-five "foreign" voyages.

46. Initially, claim was made for extensive dental damage also. This, however, was withdrawn during trial. In a brief after trial, the claimant's proctor urges an award of $45,000.

Most, if not all, of these were to South America, in the course of which his ship had to sail through the same area off Hatteras where the Mormackite sank. The medical logs of those voyages, which were made in all seasons of the year, contain no entries of any kind respecting this claimant.

Only two doctors testified. Both were called by the claimant. They were Dr. Bick, the orthopedist, and Dr. Merino, the psychiatrist. The former examined Hernandez on five occasions between November 5, 1954 and January 3, 1955; once in September, 1956 and once, the seventh and last occasion, in October, 1958. Dr. Merino examined Hernandez on two occasions: February 25, 1957 and September, 1958.

Dr. Bick in his various examinations found contusions of the chest, injury to the right shoulder muscles and, although his X-rays were negative as to the back, made a diagnosis of a herniated disc at L. 1-2. His findings as to the disc was contrary to the findings of the Public Health Service doctors at Baltimore. Dr. Bick was of the opinion that Hernandez' orthopedic condition as he found it "could be" related to the latter's Mormackite experience but may not be permanent and does not, in any event, limit his present or future capacity for carrying on his usual work. His opinion as to Hernandez' work capacity could hardly have been otherwise, in view of the claimant's actual work record since the sinking. His opinion as to the relation of the condition to the sinking is vitiated because the history he received from Hernandez and on which the doctor based his conclusion was inaccurate in at least two details which Dr. Bick considered significant. These were that, Hernandez had been torn loose from the stern of the ship by violent seas; and that after entering the water he had been struck on the shoulder by a board or other debris. I find that this part of the account of his experiences given by Hernandez to Dr. Bick is, to say the least, inaccurate. He was not torn from the ship. Neither was he struck by a board or debris.

It is true, however, that, as noted above, in December, 1954, the doctors at the Baltimore clinic found he was suffering from "strain" of the lower back and right shoulder. I find he suffered such strains.

Dr. Merino's diagnosis in 1957 was that, Hernandez was suffering from post-traumatic neurosis of "moderate" intensity. He so stated in a report prepared shortly after his examination. In a report prepared in December, 1958, he described the 1957 condition as having been "severe." At the trial he said the latter statement resulted from a "dictating mistake." Dr. Merino also had to depend, in part at least, on an inaccurate history received from Hernandez who told Dr. Merino that he saw some of his fellow crew members attacked by sharks and saw several die. Dr. Merino conceded that, if these details in the history were incorrect, his diagnosis might also be inaccurate. He further said the claimant's condition, even as he diagnosed it, does not seriously impair Hernandez' ability to continue his usual work. The latter conclusion is at least consistent with Hernandez' work and earning record since the sinking.

It was stipulated that Hernandez saw no one die and saw no one attacked by sharks.

Dr. Merino's diagnosis of post-traumatic neurosis is rejected. I find Hernandez is not suffering from post-traumatic neurosis, either severe or moderate. This finding is based not only on Hernandez' work record since the sinking, the medical history and the present testimony, but on observation of the witness who testified before me not only in support of his own claim but previously on the issue of liability.

During the four years immediately prior to the sinking Hernandez' average time at sea was 8 months and his average earnings $4,375, per year.

During the four years immediately following the sinking his average time at sea was approximately 9 months and his average earnings $5,375, per year.

The trial of Hernandez' claim was set to accommodate his sailing schedule and he shipped out within a day or two after he completed his testimony. His earning capacity has not been diminished by reason of the sinking of the Mormackite.

His work as chief steward on a merchant vessel requires an even temperament, great patience and tact. His superiors rate him highly. His efficiency as a chief steward has not been impaired in any way.

 I find that he sustained some slight permanent injuries to his right shoulder and lower back which however do not presently, and will not in the future, interfere with or impair his work capacity or efficiency. They will probably cause him some increasing discomfort as he grows older, and I so find.

I find $18,500 a fair award for Hernandez' pain and suffering, past and future.

A decree in accordance herewith, with interest from the date of the decree, may be entered on five days' notice.

## Williams Claim

This claim is made by Charles L. Williams, an ordinary seaman on the Mormackite, who survived the sinking. He was uninjured and wearing his life jacket over his work clothes when he entered the water. He got hold of a wooden pallet 4 feet by 6 feet and later on a life ring and several buoys. He remained with a group of others for a while and then drifted off by himself. Later in the afternoon he joined Del Valle and they lashed their gear together. The following day they were joined by another seaman, Davis. These three were rescued together. Williams saw no sharks and was not attacked. He did, however, hear Frost scream when attacked by the shark. He was taken from the water 49 hours after the sinking and brought to Norfolk, Virginia, where he was placed in the Public Health Service Hospital. He was then 33 years old.

He claims damages for pain and suffering in the water prior to his rescue and "permanent psychoneurosis which, while not incapacitating him from physical labor, has made work much more difficult." There is no claim for any permanent orthopedic injury or other physical illness.[47]

The petitioner contends that the alleged neurosis is a complete fabrication.

The petitioner paid maintenance amounting to $176. No claim is made for further maintenance.

The claimant was born in Royce, Mississippi and received a grammar school education there. He began going to sea on merchant vessels in 1943 when he was 22 years old. From then until 1952 he served principally in the stewards department. In 1952 he first shipped as an ordinary seaman on the Mormackite, and all of his sea service since then has been in that capacity. He holds a Coast Guard certificate for ordinary seaman, wiper and messman. Since 1957 he has resided in New York. Prior thereto he resided in Baltimore, Maryland. It was stipulated that he took long vacations in the first quarter of 1956 and the last quarter of 1957. It is conceded that he was not at sea for a period of 3½ months in 1955 due to injuries sustained in August of that year. These were not related in any way to his Mormackite experience. When allowances are made for these periods ashore, Williams' average annual sea service and earnings since the sinking are approximately the same as in the comparable period before the sinking.

At the Norfolk hospital Williams was found to have sustained only superficial abrasions. He was discharged after four days and directed to rest for two weeks. Although Baltimore was then his home, he came to New York where he remained for ten days during which he neither sought nor received any medical treatment. He then returned to Baltimore, and on October 28 and 29 he was exam-

47. In the brief after trial, his proctor urges an award of $40,000.

ined and found to have urethritis. He was found and declared fit for duty.

On November 5, 1954, after consulting a lawyer, not his present proctor, Williams returned to the clinic at Baltimore and was thereafter examined or treated on six occasions until February 5, 1955 when he was again found and declared fit for duty. It was during this series of treatments that, for the first time since the sinking, any doctor noted even an "impression of" anxiety. There was also an impression of "hypochondriacal reaction and urethritis." Williams has a Public Health Service medical record of treatments for venereal disease beginning in 1948 when he was treated for syphilis, and continuing up to 1958. There is no claim that the urethritis was caused or aggravated by the sinking. I find it was not.

Williams has received no medical treatment since February, 1955 for any injury or illness claimed to have been caused or aggravated by the sinking. Since he returned to sea in April, 1955, Williams has been found fit for duty after each physical examination he has taken prior to signing on.

Dr. Allentuck, a neuropsychiatrist, was the only witness who testified concerning the claimed permanent psychoneurosis. He was called by the claimant whom he examined on four occasions. The first was just one month after the sinking. The last three were during one week four years later, just before the trial of this claim. He testified on direct examination that, as a result of the history given him by Williams, the latter's recorded medical history since the sinking and his own examinations, he was of the opinion Williams was suffering from severe psychoneurosis which is permanent and unlikely to be curable even with competent treatment. On cross-examination he conceded that if the history he received from Williams was inaccurate or incomplete, or if Williams' complaints were exaggerated, the diagnosis could be incorrect. One of the factors the doctor thought significant was that, while being examined, Williams was nervous, and manifested this by shifting his position and picking at his clothing. However, the doctor's reactions during cross-examination were identical and he admitted that the cross-examination made him nervous. He conceded that Williams' reaction could, like his own, be that of a perfectly normal person to an unfamiliar experience. In addition, he conceded that at least some of Williams' complaints seemed exaggerated in the light of some history not disclosed to the doctor until he was cross-examined.

The doctor's opinion that Williams has a permanent psychoneurosis which was caused by the sinking is rejected. I find that the history Williams gave the doctor was significantly inaccurate and his complaints were exaggerated. This estimate of Williams is based on his work record since the sinking and his demeanor and testimony while a witness at the hearings on liability and later in support of his own damage claim. I do not accept his testimony as to his claimed nervousness and fear at sea since the sinking.

It is altogether probable that on his first voyage in 1955 Williams was to some extent nervous. But this certainly could not have lasted long. I find it did not. He served on this vessel for more than four months and, as far as appears, made no complaints.

 I find that $17,000 is a fair award for the minor physical and such temporary psychological injury as he may have sustained as a result of the sinking, and for his pain and suffering past and future.

A decree in accordance herewith, with interest from the date of the decree, may be submitted on five days' notice.